*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0277p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

NIDAL BAZZI,

        *Plaintiff-Appellant,*

    *v.*

No. 10-1553

CITY OF DEARBORN; MARWAN HAIDAR;
DANIEL SAAB,

        *Defendants,*

FRED THOMPSON,

        *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 09-10114—Bernard A. Friedman, District Judge.

Argued: July 22, 2011

Decided and Filed: September 29, 2011

Before: MOORE and KETHLEDGE, Circuit Judges; MARBLEY, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Wolfgang Mueller, OLSMAN MUELLER, Berkley, Michigan, for Appellant. Laurie M. Ellerbrake, CITY OF DEARBORN, Dearborn, Michigan, for Appellee. **ON BRIEF:** Wolfgang Mueller, OLSMAN MUELLER, Berkley, Michigan, for Appellant. Laurie M. Ellerbrake, CITY OF DEARBORN, Dearborn, Michigan, for Appellee.

_____

[*] The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.   Plaintiff-Appellant Nidal Bazzi ("Bazzi") appeals the district court's order granting summary judgment to Defendant-Appellee Fred Thompson ("Thompson").   Bazzi brought suit pursuant to 42 U.S.C. § 1983 in the United States District Court for the Eastern District of Michigan against the City of Dearborn, Thompson, Marwan Haidar ("Haidar"), and Daniel Saab ("Saab"), alleging violations of his Fourth and Fourteenth Amendment rights.   The lawsuit also included state-law claims for malicious prosecution and abuse of process against Haidar and Saab.   On March 17, 2010, the district court granted Thompson and the City of Dearborn's motion for summary judgment.   On appeal, Bazzi argues that Thompson should not have been granted summary judgment because there is evidence from which a reasonable jury could conclude that Thompson participated in a civil conspiracy which resulted in the violation of Bazzi's constitutional rights.

Viewing the facts and inferences in the light most favorable to Bazzi, a reasonable jury could find that Thompson agreed with Saab and Haidar to stop Bazzi's car without reasonable suspicion or probable cause.   We therefore **REVERSE** the portion of the district court's judgment granting summary judgment to Thompson on the claim that Thompson conspired to violate Bazzi's Fourth Amendment right against unreasonable seizure.   There is no evidence, however, that Thompson shared the greater conspiratorial objective of procuring Bazzi's arrest and the revocation of his supervised release without due process, or that Thompson conspired with Saab and Haidar to file the false police report.   We therefore **AFFIRM** the district court's judgment to the extent that summary judgment was granted to Thompson on these latter claims.

## I. BACKGROUND

Bazzi alleges that Haidar, an acquaintance; Saab, a Dearborn police officer; and Thompson, another Dearborn police officer, conspired to bring false charges against him and unlawfully seize him in order to have him sent back to prison on a supervised-release violation. Bazzi had been employed by Haidar for several months, but stopped working for him in May 2006. The relationship between the two men then became very contentious.

One incident in particular gave rise to the present dispute. Haidar had been indicted on charges of wire fraud, and Bazzi sent a copy of a federal fraud indictment against Haidar to Haidar's girlfriend. Bazzi had been convicted in 1994 of conspiracy to possess cocaine with intent to distribute and distribution of cocaine. Following his release from prison in 2004, Bazzi was on federal supervised release. If Bazzi violated the terms of his supervised release, he could be sent back to prison. Bazzi claims that Haidar, to get back at Bazzi for distributing the indictment, conspired with Saab and Thompson to have Bazzi arrested for a supervised-release violation.

Haidar spoke with Saab about his conflict with Bazzi, and Saab suggested that they fabricate a police report alleging that Bazzi broke the window of Haidar's car. Saab told Haidar that he would have Thompson make the report. Later, Saab asked Thompson to write the report, but Thompson declined. Without Thompson's participation, Saab and Haidar decided to generate the false police report themselves. On the night of January 6, 2007, Saab and Haidar wrote up a report stating that Bazzi threw a glass bottle at Haidar's van, causing a window to break.[1] Saab testified in his deposition that while he was writing up the false police report, Haidar "told me . . . that Fred Thompson was going to help him with Nidal Bazzi, stopping him." R. 47-8 at 68 (Saab Dep.).

At 11:52 p.m. on the same night that Saab and Haidar produced the false police report, Thompson received a telephone call from Saab on his personal cell phone.

---

[1] Haidar confirmed at Saab's criminal trial that Bazzi did not in fact break the window on Haidar's vehicle.

During the phone call, Saab told Thompson, "Bro, some guy's going to call you, just talk to him." R. 47-6 at 32 (Thompson Dep.). Thompson asked, "Who?" and Saab hung up. *Id.* at 32, 34. A few minutes later, Thompson received a call to his cell phone from Haidar, followed by nine more calls from Haidar within one hour. Haidar told Thompson that Bazzi was carrying guns and drugs in his car and that his cousin saw Bazzi with a gun. Haidar also told Thompson that Bazzi was driving a white Nissan Altima and provided Thompson with Bazzi's location.

Thompson was on patrol at the time with Officer Lindsay Cox. After receiving Haidar's tip, the officers waited for Bazzi at a location provided by Haidar. Thompson claims that after observing Bazzi speeding and running a stop sign, the officers called for backup and pulled over Bazzi's vehicle. Bazzi consented to a search of his vehicle, and the officers did not find any weapons or drugs. Thompson apologized for inconveniencing Bazzi and allowed him to leave. No traffic citations were issued. Cox wrote up an internal report about the stop, in which she falsely reported that Bazzi was stopped on suspicion of driving a stolen vehicle.

As a result of the false police report filed by Saab and Haidar, Bazzi was arrested for violating the terms of his supervised release. On January 28, 2008, Bazzi's federal charge of violation of supervised release was dismissed. After the Dearborn Police Department's investigation into the false police report and other misconduct, Saab was forced to resign. Saab was tried in federal court for the crimes of witness and evidence tampering based on the allegations that he made a false police report against Bazzi and attempted to persuade Haidar to testify falsely at the supervised-release hearing. A jury found Saab not guilty on all counts. *United States v. Daniel Saab*, Case No. 2:07-cr-20388 (E.D. Mich).

On January 9, 2009, Bazzi filed the instant suit against Saab, Haidar, Thompson, and the City of Dearborn. Saab entered into a Consent Judgment with Bazzi, and Bazzi and Haidar stipulated to the entry of an order granting summary judgment for Bazzi against Haidar. Thompson and the City of Dearborn moved for summary judgment, which the district court granted on March 17, 2010. Bazzi timely appealed.

## II.  ANALYSIS

### A.  Standard of Review

We review de novo a district court's decision granting summary judgment. *Burchett v. Kiefer*, 310 F.3d 937, 941 (6th Cir. 2002).  Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2) (2009).  In reviewing the grant of Thompson's motion for summary judgment, this court must "view all facts and any inferences in the light most favorable" to Bazzi, the nonmoving party.  *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390 (6th Cir. 2009); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment should be denied if "there is a genuine need for trial," which turns on "whether the evidence is such that a reasonable jury could return a verdict for the plaintiff."  *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 375 (6th Cir. 2002).

### B.  Civil Conspiracy

#### 1.  Single Conspiracy

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action."  *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007).  To prevail on a civil conspiracy claim, Bazzi must show that (1) a "single plan" existed, (2) Thompson "shared in the general conspiratorial objective" to deprive Bazzi of his constitutional (or federal statutory) rights, and (3) "an overt act was committed in furtherance of the conspiracy that caused injury" to Bazzi.  *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985).  "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy [and] [e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved."  *Id.*

Bazzi alleges a conspiracy among Haidar, Saab, and Thompson to violate Bazzi's constitutional rights by having him arrested and his supervised release revoked without due process.  There is no evidence, however, from which to infer that Thompson shared a conspiratorial objective of such broad scope.  To the contrary, Thompson expressly

opted out of the key component of such a plan—the issuance of a false police report against Bazzi.  Instead, Bazzi effectively describes two separate conspiracies.  First, he alleges that the co-conspirators violated his Fourth and Fourteenth Amendment rights by conspiring to file a false police report.  Second, he alleges that they violated his Fourth Amendment rights by conspiring to have his car pulled over during an "unlawful pretextual stop."  Appellant Br. at 25.  Although Haidar and Saab shared a single conspiratorial objective which unified the two plans, no such greater goal can be established with respect to Thompson.  *See Hooks*, 771 F.2d at 944 (concluding that, "[i]n effect, plaintiff allege[d] the existence of two separate conspiracies" because actions were not part of a single plan); *see also United States v. Sinito*, 723 F.2d 1250, 1256-57 (6th Cir. 1983) (summarizing factors to be considered by a trial court in a criminal case "in determining whether two conspiracies arise from a single agreement").

As discussed *infra*, a reasonable jury could infer that Thompson agreed to seize Bazzi without reasonable suspicion or probable cause.  But evidence of Thompson's agreement is limited to that particular conspiracy.  Saab's testimony about Thompson's involvement in the vehicle stop and Haidar's series of ten telephone calls to Thompson on the night of the stop do not permit the *additional* inference that Thompson agreed to the *greater* harm of having Bazzi arrested and his supervised release revoked without due process.  The "web of inference[s] is too weak" on the alleged facts to permit a finding, "absent sheer speculation," that Thompson shared this larger unlawful objective. *United States v. Sliwo*, 620 F.3d 630, 637 (6th Cir. 2010) (internal quotation marks omitted); *see Gutierrez v. Lynch*, 826 F.2d 1534, 1539 (6th Cir. 1987) (allegations of a conspiracy are "insufficient to withstand a motion for summary judgment [if they] . . . lack the requisite material facts and specificity necessary to sustain a conspiracy claim.").

With respect to the first separate conspiracy, Bazzi provides no evidence that Thompson shared the conspiratorial objective of violating Bazzi's Due Process and Fourth Amendment rights by issuing a false police report.  To the contrary, Bazzi conceded that Thompson declined Saab's request to issue it.  Only "vague and

conclusory allegations unsupported by material facts" are offered to suggest that Thompson was otherwise involved in this conspiracy. *Gutierrez*, 826 F.2d at 1538. Thus, even though Thompson "need not have known all of the details" of the particular plan, *Hooks*, 771 F.2d at 944, there is no evidence from which a reasonable jury could infer that Thompson agreed to the general conspiratorial objective of violating Thompson's constitutional rights through the issuance of the false police report.

### 2. Conspiracy to Stop Bazzi

#### a. Constitutional Violation

In contrast, Bazzi does present evidence sufficient to overcome summary judgment on the claim that Thompson conspired to stop him without reasonable suspicion or probable cause. First, Bazzi alleges facts from which a reasonable jury, taking the facts and inferences in Bazzi's favor, could conclude that Bazzi's constitutional rights were violated. The Fourth Amendment protects against unreasonable seizures, and a vehicle stop by a police officer is a "'seizure' within the meaning of the Fourth Amendment." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). Accordingly, to render a vehicle stop constitutional, "an officer must have probable cause to make a stop for a civil infraction, [or] reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *Id.*

Thompson claims that he had probable cause to stop Bazzi's vehicle because he observed Bazzi's traffic violations, and reasonable suspicion because he relied on Haidar's tip. The district court found that there was no evidence that Thompson violated Bazzi's Fourth Amendment rights because Thompson witnessed Bazzi speeding and disobeying a stop sign before stopping him, providing Thompson with probable cause. Because the district court concluded that the traffic violations provided probable cause, the district court did not decide whether Haidar's tip provided reasonable suspicion to justify Thompson's stop of Bazzi's car.

(**i**) **Probable Cause**

Turning first to the traffic violations, Thompson asserts that the stop was supported by probable cause arising from Thompson's observation that Bazzi was speeding and ran a stop sign. A traffic violation provides probable cause to justify a stop "even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995). Accordingly, "[w]hen a traffic stop is supported by probable cause, an officer's subjective intent" behind stopping the vehicle "is irrelevant." *Blair*, 524 F.3d at 748 (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). Thus, even if Bazzi's traffic violations were merely a pretext for the stop, they would have provided Thompson with probable cause, rendering the stop lawful.

The traffic violations themselves, however, are subject to dispute. In his brief, Bazzi points to a series of specific facts from which a jury could conclude that Thompson lacked probable cause: Bazzi testified that he was "driving carefully," at the time of the stop because his license would have been revoked if he had been cited for a moving violation, R. 47-12 at 61 (Bazzi Dep.); Bazzi was not cited for a traffic violation after the stop; Thompson apologized to Bazzi for inconveniencing him at the conclusion of the search; and Thompson's partner wrote in an internal report that they had stopped Bazzi for suspicion of a stolen vehicle and later admitted that this was false information.[2]

A jury could conclude from these facts that Thompson lied about observing Bazzi speeding or running a stop sign, and therefore lacked probable cause to stop Bazzi's car.

---

[2]In addition, a lieutenant of the Dearborn Police Department reviewed the report regarding the stop as part of the investigation of Saab and concluded that there was nothing reasonable to warrant the stop. The investigator apparently based this conclusion on the contents of Cox's report, which Cox admitted to be false, rather than on Thompson's observation of moving violations. This report, therefore, may be of limited use in evaluating the reasonableness of the stop, but it does call into question the credibility of Thompson and Cox.

### (**ii) Reasonable Suspicion**

In the alternative, Thompson asserts that the stop was justified by reasonable suspicion arising from Haidar's tip that Bazzi had guns and drugs in his car. Under *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer may conduct an investigatory stop only if he "has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity," *United States v. Place*, 462 U.S. 696, 702 (1983) (citing *Terry*, 392 U.S. at 22). A *Terry* stop "must be based on specific, objective facts," *Brown v. Texas*, 443 U.S. 47, 51 (1979), and requires that "the detaining officers . . . have a particularized and objective basis for suspecting the particular person stopped of criminal activity," *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). These facts must "warrant a man of reasonable caution in the belief that [a stop] was appropriate." *Terry*, 392 U.S. at 22 (internal quotation marks omitted).

By itself to provide reasonable suspicion to make the investigatory stop, an informant's tip must provide sufficient "indicia of reliability," *Adams v. Williams*, 407 U.S. 143, 147 (1972), to warrant "reasonable, articulable suspicion" of criminal activity, *Place*, 462 U.S. at 702. "[A]n informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of [the informant's] report." *Illinois v. Gates*, 462 U.S. 213, 230 (1983). These "closely intertwined issues" bear upon the totality of the circumstances that determine whether reasonable suspicion existed to believe that a person possessed contraband. *Id.* (applying factors to anonymous tip in probable-cause context); *see Alabama v. White*, 496 U.S. 325, 328-30 (1990) (applying factors to anonymous tip in the reasonable-suspicion context); *United States v. Johnson*, 620 F.3d 685, 696 (6th Cir. 2010) (concluding that 911 call did not provide reasonable suspicion because it failed to make any "specific allegation" of criminal activity or provide "predictive information" about the suspects).

To be sure, "reasonable suspicion can arise from information that is less reliable than that required to show probable cause," and a tip of "a relatively low degree of reliability" may provide reasonable suspicion if "more information" is provided than is ordinarily required. *White*, 496 U.S. at 330. A tip from an informant "whose reliability

is not established" may support a finding of reasonable suspicion if "there is some independent corroboration by the police of the informant's information." *United States v. Tuttle*, 200 F.3d 892, 894 (6th Cir. 2000); *see Gates*, 462 U.S. at 241-46. "Some tips," however, "completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized." *Adams*, 407 U.S. at 147.

Taking the facts and inferences as alleged by Bazzi, we conclude that Haidar's tip falls short. Under the totality of the circumstances as alleged by Bazzi, Haidar's tip was "completely lacking in [the] indicia of reliability" necessary to justify a forcible stop. *Adams*, 407 U.S. at 147. As Thompson conceded, Saab asked him to fill out a police report for Haidar against Bazzi for property damage to which Thompson responded that he was "not going to do it and [Saab] shouldn't do it either." R. 47-6 at 39 (Thompson Dep.). Thompson agreed in his deposition testimony that he considered Haidar to be a "troublemaker" and a "knucklehead," and that he may have told other police officers that Haidar is an "asshole." *Id.* at 15. He testified that he knew that Haidar had been indicted for fraud and that he was "[a]bsolutely not" surprised. *Id.* at 38. Thompson also acknowledged that Haidar had never provided him with a tip before.

Haidar was not an anonymous informant whose reliability was unknown to Thompson such that corroborating information was necessary in place of a credibility assessment. Instead, Thompson "knew that [the informant] w[as] of highly questionable veracity and possessed personal animosity against" the subject of the report and "thus that the[] accusations lacked sufficient indicia of reliability to warrant an objective reasonable suspicion that the plaintiff might be dangerous." *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir. 1999). Haidar accurately described Bazzi's vehicle and its location. Thompson was also aware that Bazzi was a convicted felon. But reasonable suspicion "requires that a tip be reliable in its *assertion of illegality*, not just in its tendency to identify a determinate person," *Florida v. J.L.*, 529 U.S. 266, 272 (2000) (emphasis added), and there was no corroborating evidence of the otherwise unreliable

assertion that Bazzi possessed guns and drugs. Bazzi therefore alleges facts from which a jury could conclude that Bazzi suffered a constitutional deprivation.

### b. Agreement

Crucially, there are specific facts from which a jury could infer that Thompson ultimately agreed to Haidar and Saab's plan to stop Bazzi without a lawful basis. Saab testified in his deposition that he saw Thompson and Haidar together at Haidar's gas station and restaurant. Thompson and Haidar both stated that Saab asked Thompson to write up the police report and that Thompson refused. Saab testified in his deposition that while he was writing up the false police report, Haidar "told me that night that Fred Thompson was going to help him with Nidal Bazzi, stopping him." R. 47-8 at 68 (Saab Dep.). Saab testified that "[Haidar] talked to me at the time I was making this report that he talked to Fred Thompson . . . . and then he and Fred Thompson were going to do this deal there on Wyoming and he was waiting for a call from the house, that when he left, him and Fred were going to get this guy." *Id.* at 44-45. The night of the traffic stop, moreover, Thompson received a telephone call from Saab on his personal cell phone, informing him that someone was going to call him. Thompson then received ten calls to his personal cell phone from Haidar within one hour.

"Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire[; thus,] circumstantial evidence may provide adequate proof of conspiracy." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000) (internal quotation marks omitted). In this case, the evidence that Thompson shared the conspiratorial objective to stop Bazzi unlawfully included Saab's testimony that Haidar and Thompson agreed to stop Bazzi, Thompson's testimony that he knew about Haidar and Saab's plan to file a false police report, and the series of ten telephone calls to Thompson from Haidar on the night of the stop. Taking the facts and inferences in Bazzi's favor, we conclude that these facts provide sufficient circumstantial evidence from which a reasonable jury could infer the existence of a shared conspiratorial objective among Haidar, Saab, and Thompson to seize Bazzi without reasonable suspicion or probable cause.

## C.  Qualified Immunity

If Thompson is entitled to qualified immunity, then he is entitled to summary judgment, whether or not Bazzi alleges sufficient evidence of a conspiracy.  Thompson suggests that the district court granted him qualified immunity.  The district court granted summary judgment based on its findings that "[t]here is simply no evidence that Thompson agreed with Saab and Haidar to deprive [Bazzi] of his rights" and no "evidence that Thompson violated Bazzi's Fourth Amendment rights by stopping and briefly detaining him."  R. 49 at 6 (District Court Op.).  The second finding would support a grant of qualified immunity, but there is no explicit mention of qualified immunity in the opinion.

Nonetheless, "[w]e may affirm the district court's judgment on any ground supported by the record, including on a basis not mentioned in the district court's opinion." *Westfield v. Federal Republic of Germany*, 633 F.3d 409, 413 (6th Cir. 2011). "Qualified immunity is a question of law, but 'where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability.'" *McKenna v. Edgell*, 617 F.3d 432, 437 (6th Cir. 2010) (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004)). "'Thus, to the extent that there is disagreement about the facts'" such as whether Thompson witnessed Bazzi commit traffic violations "'we must review the evidence in the light most favorable to [Bazzi], taking all inferences in [his] favor.'" *Id.*

In determining whether qualified immunity applies, we ask, "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006) (internal quotation marks omitted).[3]  Because Thompson has raised qualified immunity as a defense, Bazzi bears the burden of demonstrating that Thompson is not entitled to qualified immunity. *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010).

---

[3]We may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances," of this particular case. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As outlined *supra*, a constitutional violation could be proven: Bazzi has alleged specific facts at this stage showing that Thompson violated his Fourth Amendment rights when Thompson stopped Bazzi's vehicle without reasonable suspicion or probable cause. The remaining question is whether the violated right was clearly established such that at the time the act was committed, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Smoak*, 460 F.3d at 778 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Bazzi's Fourth Amendment rights were clearly established when the seizure occurred. *Terry* required reasonable suspicion for investigatory seizures, and the Supreme Court has emphasized that the reliability of tips from police informants is a significant factor in determining whether reasonable suspicion exists. *See J.L.*, 529 U.S. at 271-72 (concluding that anonymous tip regarding firearm did not provide reasonable suspicion for a *Terry* stop because it was not reliable in its assertion of illegality and provided no predictive information from which officers could test the informant's knowledge or credibility); *see also Adams*, 407 U.S. at 146-47 (upholding *Terry* stop because officer received information from a known informant who had provided him with information in the past and the tip was immediately verifiable); *McCray v. Illinois*, 386 U.S. 300, 303-04 (1967) (concluding that information from a proven and reliable informant, combined with police corroboration of the informant's tip, established probable cause). The "premise" of these cases—that unreliable tips lacking sufficient corroboration do not give rise to reasonable suspicion—"has clear applicability" to this set of facts such that "the unlawfulness of the alleged conduct should have been apparent to [Thompson]." *Hope v. Pelzer*, 536 U.S. 730, 743 (2002).

Accordingly, we have considered the identity and reliability of an informant when assessing whether an officer possessed reasonable suspicion for a stop. *See, e.g.*, *Dorsey v. Barber*, 517 F.3d 389, 396-98 & n.3 (6th Cir. 2008) (determining that identified informant's tip which provided specific facts corroborated by officers' observations generated reasonable suspicion); *Feathers v. Aey*, 319 F.3d 843, 850 (6th Cir. 2003) (no reasonable suspicion when anonymous tip lacked the reliability that

would come from "an identified or repeat informant" and tip failed to allege criminal activity). We have concluded in a § 1983 suit that an officer lacked reasonable suspicion for a *Terry* frisk when the officer "knew that [the informants] were of highly questionable veracity and possessed personal animosity against [the plaintiff]." *Painter*, 185 F.3d at 569; *cf. United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000) (en banc) (informant's tip provided probable cause for search when informant was known to the investigator and his "reliability in criminal matters in which the detective was involved had extended over a five-year period"). Similarly here, Thompson knew that Haidar was not credible and bore a personal grudge against Bazzi.

Factual doubt remains regarding whether Bazzi was engaged in traffic violations, so we must assume for purposes of summary judgment that the stop was supported only by the unreliable tip. In light of Supreme Court precedent establishing that unreliable tips fail to establish reasonable suspicion, we conclude that it would have been clear to a reasonable officer that stopping Bazzi's vehicle based only on Haidar's tip would violate Bazzi's clearly established Fourth Amendment right against unreasonable seizure.

## III. CONCLUSION

Viewing the facts and inferences in the light most favorable to Bazzi, a reasonable jury could find that Thompson agreed with Saab and Haidar to stop Bazzi's car without reasonable suspicion or probable cause. We therefore **REVERSE** the portion of the district court's judgment granting summary judgment to Thompson on the claim that Thompson conspired to violate Bazzi's Fourth Amendment right against unreasonable seizure. There is no evidence, however, that Thompson shared the greater conspiratorial objective of procuring Bazzi's arrest and the revocation of his supervised release without due process, or that Thompson conspired with Saab and Haidar to file the false police report. We therefore **AFFIRM** the district court's judgment to the extent that summary judgment was granted to Thompson on these latter claims.