NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name:  14a0420n.06

Case No. 13-1574

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| NEILEIGH REGETS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| CITY OF PLYMOUTH, et al., | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | O P I N I O N |

BEFORE:  BATCHELDER, Chief Judge, McKEAGUE, Circuit Judge, and OLIVER, District Judge.[*]

**McKEAGUE, Circuit Judge.**  Neileigh Regets sued on behalf of herself and the estate of her deceased husband, Thomas Steiner, asserting claims under 42 U.S.C. § 1983 against the City of Plymouth (the "City") and three of its police officers ("Defendants").  Regets alleges that the officers violated her and Steiner's constitutional rights by conducting an unreasonable search and seizure after the police received a tip from Christopher Kish ("Kish"), Regets's former boyfriend, that she planned to assist Steiner in committing suicide. The district court granted

---

[*] The Honorable Solomon Oliver, Chief Judge, United States District Court for the Northern District of Ohio, sitting by designation.

summary judgment to the Defendants, finding that the officers and municipality were entitled to qualified immunity. We **AFFIRM**.

## I.

Neileigh Regets ("Regets") met decedent Thomas Steiner ("Steiner") in 2002; they married in 2006. At the time of their marriage, Regets was twenty-six years old and Steiner was sixty-two. Regets has a daughter and a son from two prior relationships. In 2009, Regets and her children lived in a house in Plymouth, Michigan. Steiner lived at an Extended Stay hotel in Canton, Michigan because he had health problems that caused emotional outbursts and short-term memory loss.

Steiner took medication for problems with bi-polar disorder, Alzheimer's, blood pressure, and depression. A mail-order prescription service delivered Steiner's medications to Regets's house, and she would take all the medication to him. Regets would visit Steiner at the hotel almost every day. Shortly after the beginning of 2009, Regets stopped preparing Steiner's pills for him and let Steiner take his own medication. When Steiner's doctors would change his prescriptions, Regets would keep the remaining medication at her house in case the doctors re-prescribed the same medications.

During the first six months of 2009, Steiner talked about being unhappy and about how it was hard to keep going on, which Regets understood to refer to suicide. Steiner told Regets he was frustrated because simple tasks took him longer to accomplish than before. Regets hesitated to take Steiner large amounts of pills, and she checked his medication on almost a daily basis to ensure he was taking proper amounts.

A. Kish's Tip

Christopher Kish ("Kish") is the father of Regets's son. Near the end of 2004, Kish attempted to strangle Regets, which led to Regets's filing a police report in Livonia, Michigan. Kish was not regularly involved in his son's life. In June 2009, Kish visited Regets and told her that he wanted to be a father to his son. Kish would come to Regets's house and play with his son, and he also babysat Regets's children while Regets and Steiner went out to dinner.

Regets testified that at some point in June of 2009, Kish asked Regets for money and she refused to give him any. Kish told Regets that she was "screwed." Regets testified that, although she understood that statement to mean that her life was in danger, she did not report the incident to any authorities. Prior to June 19, 2009, Regets had not reported any problems with Kish to the Plymouth Police Department.

On June 18, 2009, Kish went to the Plymouth Police Department to provide a statement. Kish initially spoke with Officer Matt Stoops. Officer Stoops then asked then-Lieutenant Al Cox to join the conversation with Kish. Officer Cox recognized Regets's name because there had been a series of issues between Regets and her neighbors.

Kish told the officers that he had a son with Regets and that he had just recently returned to Michigan. Kish told the officers that on several occasions while he was visiting his son since returning to Michigan, Regets had stated that she was going to help Steiner commit suicide. The officers asked Kish to write out a written statement. Kish's written statement, signed under penalty of perjury, states:

> This statement is about Neileigh Regets and the attempt to help Tom Steiner commit suicide. I arrived in town on June 12th. Upon visiting my son, Neileigh has had many talks about helping Tom commit suicide. Neileigh told me that she is going to help Tom commit suicide before his life insurance policy ends. She also stated that she is going to give him pills that have been delivered to her house

on Arthur Street. When the pills arrived at her house, she looked up at me and said "these are the pills" then her daughter Kaylee said "those are the pills" like she knew what was happening. Tom and Neileigh also discussed waiting to commit suicide after Father's Day. They also discussed when Neileigh was to call if he didn't answer the phone then that was the sign to come to the hotel and find him. Tom also stated that he wanted to give one of his sons a Rolex. She told me she wanted to keep it for money it was worth 19,000 and she already found someone to buy the watch for $9,000.

Note – the bag with the pills is a small grayish white bag. Was last seen in office on floor on left side of desk.

R. 52-7, Cox Stmt. at 2–3, PageID # 753–54. Kish also provided the officers with a handwritten diagram of Regets's house and the location of the pills.

Officer Cox discussed the situation with then-Chief Wayne Carroll. Chief Carroll instructed Officer Cox to contact the Wayne County Prosecutor's Office. Chief Carroll testified that he was aware that Kish had a prior relationship with Regets.

After Kish left the police station, Officer Cox called the Wayne County Prosecutor's Office and spoke with Assistant Prosecutor Barb Smith, who referred him to Bob Stevens ("Stevens") of the homicide unit. After learning what Kish had told the officers, Stevens stated that he wanted to speak with Kish himself. The following day, Officer Cox picked up Kish and took him to the Wayne County Prosecutor's Office. Stevens put Kish under oath and then questioned Kish about his statement. Kish told Stevens the same story as he had told Officer Cox the day before. According to Officer Cox, following the meeting with Kish, Stevens told Cox that the officers needed to take Regets into custody and to get a search warrant for her house, which Cox understood meant there was probable cause to take Regets into custody. Stevens denies telling anyone to take Regets (or anyone else) into custody, but agrees that he determined that there was probable cause to support search warrants for Regets's house and Steiner's hotel

room. In any event, Officer Cox sought search warrants for both places, and on June 19, 2009, two search warrants were issued and signed by Judge Plakas.

B. <u>Search of Regets's Home and Her Arrest</u>

On June 19, 2009, Chief Carroll, Officer Cox, and Officer Grabowski went to Regets's house to execute the search warrant. Regets was outside of the residence when they arrived. Officer Cox informed Regets that she was being arrested for attempting to assist Thomas Steiner commit suicide in violation of Michigan law. Regets denied the allegation and was placed under arrest, handcuffed, and taken into custody. Regets's children were present at the time of her arrest.

Following Regets's arrest, the police officers conducted a search of her home and confiscated 25 prescription bottles from the house, a sandwich bag with suspected marijuana, and drug paraphernalia.

C. <u>Search of Steiner's Hotel Room</u>

Several Plymouth police officers then conducted a search of Steiner's room at the Extended Stay America hotel and confiscated certain medications. When they entered the hotel room, they found it dark and empty. Steiner was not there. Upon entering the hotel room, Officer Grabowski saw a number of prescription bottles lined up on a table and, based on the way the bottles were lined up, he concluded those bottles contained daily medications. Officer Grabowski decided not to confiscate the bottles on the table and to leave them behind for Steiner. However, Officer Grabowski did not know how long the pills in the bottles would last. Officer Grabowski decided to confiscate two sealed grayish-white mailing packages from the hotel room, which sounded like they contained pills. The officers did not open the sealed packages.

Officer Grabowski gave Officer Cox Steiner's telephone number and Officer Cox called Steiner after the officers finished their search. Steiner told Officer Cox that the medications they had taken from his hotel room were for his bipolar condition, memory loss, his heart, and his cholesterol. Steiner advised Officer Cox that the medications were strong and that if he were to take an overdose of them, he believed he would die. Steiner told Officer Cox that while he talked about suicide he denied that Regets had ever helped him plan to commit suicide. When Officer Cox asked Steiner how he was feeling at that time and if he had any intention of harming himself, Steiner replied that he was feeling good and was not going to attempt suicide.

Officer Cox asked Steiner about the packages that the officers had confiscated from his hotel room. Steiner advised Officer Cox that Regets had delivered those packages to him a day or two before the search and that if he had really intended to kill himself, he would have taken the pills the day that Regets delivered them. Officer Cox asked Steiner if he had sufficient medications without the two packages of medications that the officers had confiscated that day. Steiner told Officer Cox that he would be fine over the weekend and into the week when he could go to the pharmacy and get another prescription for those medications. Officer Cox testified that he pressed Steiner on this issue and that Steiner responded again that he would be fine without the medication that the officers had confiscated.

D. Regets's Release from Custody

On June 22, 2009, Regets was released from jail. When Regets was taken into custody, the officers took away her phone. Upon retrieving it from the police, Regets discovered that while she was in jail, she had she received 30 phone calls from Steiner and he had left her 14 messages. After being released from custody, Regets went to the Extended Stay to make sure her husband was all right. Regets asked the receptionist to check on Steiner in his room. After

checking on Steiner, the receptionist initially told Regets that Steiner was sleeping. However, Regets asked the receptionist to check again and, when she returned, she said to call 9-1-1. Steiner was found dead at the Extended Stay hotel in Canton, Michigan, on June 22, 2009. An expert witness retained by Regets, Dr. Werner Spitz, was prepared to testify at trial that "Mr. Steiner died as a result of the sudden and unexpected withdrawal of [his] prescribed medications which negatively impacted his heart. Hence, had Mr. Steiner been given his prescribed medication outlined above in their therapeutic levels, Mr. Steiner would not have died that day from these conditions." R. 52-10, Aff. Dr. Spitz. at 6, PageID # 775.

E. District Court Proceedings

On April 21, 2011, Regets filed a Complaint, naming the City of Plymouth and the following three officers as Defendants: 1) Chief Wayne Carroll; 2) Lieutenant Al Cox; 3) Sergeant Jamie Grabowski. In her Complaint, Regets[1], individually, and as personal representative of the Estate of Thomas Steiner ("the Estate"), raised an assortment of claims.

On November 16, 2012, Defendants moved for summary judgment on Regets's claims pursuant to Fed. R. Civ. P. 56(c). On April 8, 2013, the district court concluded that the individual defendants were entitled to qualified immunity on all of Regets's § 1983 claims and to summary judgment on the state law claims; and that the City was entitled to summary judgment on all of the claims against it because Regets had failed to establish any basis for municipal liability on any of those claims.

---

[1] Regets asserted claims as the Representative of the Estate of Thomas Steiner and Individually. We have identified those claims on the basis of which capacity Regets is stating the claim.

## II.

### A. Standard of Review

This court reviews a district court's grant of summary judgment *de novo*. *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing a grant of summary judgment, we must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Defendant bears the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Plaintiff's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 250–51.

### B. Overview of 42 U.S.C. § 1983

"Section 1983 provides a cause of action against any person who, under color of state law, deprives an individual of any right, privilege, or immunity secured by the Constitution and federal law." *McNight v. Rees*, 88 F.3d 417, 419 (6th Cir. 1996). Section 1983 claims are subject to the affirmative defense of qualified immunity which, if applicable, shields individuals not just against liability but against the suit itself. The doctrine of qualified immunity "shields

'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a court evaluates the defense of qualified immunity on a motion for summary judgment the court "'adopt[s] . . . the plaintiff's version of the facts.'" *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)). The burden rests on the plaintiff, however, to show that the defendant is not entitled to immunity. *Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012). A defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Three individual officers are defendants in this case (Officers Cox, Grabowski, and Carroll). "Each defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). Plaintiff asserts the following claims against the three individual defendants, each of which will be addressed in turn: 1) Violation of Fourth Amendment—Unreasonable Search and Seizure (Neileigh Regets/Estate of Thomas Steiner) (Count II); 2) False Arrest and False Imprisonment (Neileigh Regets/Estate of Thomas Steiner) (Count I); 3) Civil Conspiracy (Neileigh Regets) (Count III); 4) Deliberate Indifference to a Known Medical Condition (Count VI) (Estate of Thomas Steiner); and 5) intentional infliction of emotional distress. The City of Plymouth's liability for deliberate indifference will be discussed separately.

**1. Fourth Amendment: Search and Seizure**

Regets claims that Defendants violated her and Steiner's right to be free of unreasonable search and seizure because they did not have probable cause to enter her home or Steiner's hotel room and confiscate prescription medications. "Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012). The issuance of a warrant by a neutral magistrate does not end the inquiry; a plaintiff may maintain a lawsuit if no reasonably competent officer could have concluded that a warrant should be issued. *Id.* However, the "threshold for establishing this exception is a high one." *Id.*

In *Messerschmidt*, the police officers sought and obtained approval of the search warrant from a superior officer and a deputy district attorney, both of whom approved the request for a warrant without any reservations. The police officer then submitted it to the magistrate, who issued the requested warrant. *Id.* at 1249. The Supreme Court concluded that "it cannot be said that 'no officer of reasonable competence would have requested the warrant.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 346 n.9 (1986)). The Court noted that a "contrary conclusion would mean not only that the [police officers] were 'plainly incompetent,' but that their supervisor, the deputy district attorney, and the magistrate were as well." *Id.* (internal citations omitted).

Regets contends that the officers are not entitled to immunity because the warrants authorizing the searches of Regets and Steiner's respective homes were not supported by probable cause. We disagree. A neutral magistrate issued a warrant for the searches and a competent officer could have concluded that a warrant should be issued.

Defendants followed standard protocol for obtaining a valid search warrant. Kish provided a written statement signed under penalty of perjury. He also provided a handwritten diagram of Regets's house and the location of the pills. Prior to seeking a warrant, Officer Cox consulted with multiple individuals. He discussed Kish's statement with Chief Carroll who told him to contact the Wayne County Prosecutor's Office. An assistant prosecutor referred Cox to Stevens of the homicide unit who himself put Kish under oath and questioned him about his statement. Kish's story was the same as the day before. Whether Stevens told Officer Cox to take Regets into custody or merely advised that there was probable cause for obtaining search warrants, there is no dispute that the officers did seek and obtain form Judge Plakas warrants to search both Regets's house and Steiner's hotel room. Obtaining these warrants from Judge Plakas indicates preliminarily that Defendants acted in an objectively reasonable manner.

Furthermore, this case does not fall within the narrow exception identified in *Messerschmidt*. Defendants consulted with numerous individuals prior to seeking the warrants and reasonably relied on Stevens's opinion that probable cause existed. As in *Messerschmidt*, "it cannot be said that 'no officer of reasonable competence would have requested the warrant'" or that Cox, Carroll, Stevens, and Judge Plakas are "plainly incompetent." *Messerschmidt*, 132 S. Ct. at 1249. Nothing in the record supports the conclusion that the magistrate's decision to issue a warrant should not insulate Defendants from liability. No evidence suggests that Defendants acted based on faulty or incomplete information.

Regets relies heavily on her argument that Kish was not a credible informant. She asserts that an objectively reasonable officer would have investigated Kish's claims further before seeking a warrant because Kish had an "ax to grind" with Regets based on their past relationship. In her view, because she had filed a police report in 2004 in Livonia, Michigan, alleging that

Kish had attempted to strange her, and because Kish was attempting to develop a relationship with his child, the police should have known that Kish lacked credibility and possessed a motive to lie and mislead.

While Kish may have had ill motives in going to the police, the police were not unreasonable in crediting Kish's story. First, while Chief Carroll was aware that Kish and Regets had a prior relationship, the officers did not know about the Livonia incident alleging the attempted strangling or about Kish's desire to reunite with his child. Second, their interaction with Kish gave no reason to doubt his credibility. Kish gave Defendants a detailed account of the alleged plan to accomplish Steiner's suicide, along with a diagram indicating where he had personally observed the medications. Kish repeated his allegations under oath before the Wayne County Assistant Prosecutor, Stevens, and his testimony remained consistent. Accordingly, Defendants had reasonable grounds to believe they would find medications at Regets's home and Steiner's hotel room. Regets has failed to cite any authority that Defendants were required to more thoroughly investigate Kish and his claims before seeking the issuance of the search warrants. *See, e.g., United States v. Kinison*, 710 F.3d 678, 682 (6th Cir. 2013) (holding that a known informant's statement can support probable cause even though the affidavit fails to provide any additional basis for the known informant's credibility).

Regets also argues that Kish's statement alone, even if credible, was insufficient to support probable cause for the warrants. She argues that based on *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005), the police needed substantial independent corroboration of Kish's hearsay allegations. Her argument is misplaced. As the district court noted, *Frazier* involved a confidential informant, whereas Kish was a known informant identified in the search

warrant affidavit who also provided a sworn written statement. Thus, no corroboration was necessary.

Regets has not provided sufficient evidence to show Defendants violated her constitutional right to be free of unreasonable search and seizure; thus, we affirm the district court's grant of summary judgment to Defendants on this claim.

### 2. False Arrest and False Imprisonment

#### a. Neileigh Regets

Regets claims that Defendants violated her constitutional rights by arresting her without probable cause. A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff. "Whether probable cause exists depends on the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *United States v. Pearce*, 531 F.3d 374, 380–81 (6th Cir. 2008) (internal citation and quotations omitted). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (internal quotation marks omitted). "A [police officer] is entitled to qualified immunity" on a false arrest and false imprisonment claim "if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the [police officer]." *Kennedy v. City of Vila Hills*, 635 F.3d 210, 214 (6th Cir. 2011). Thus, a court should grant the officer qualified immunity, "even if a factual dispute exists about the objective reasonableness of the officer's actions," if when viewing the facts in the light most favorable to the plaintiff, "an officer reasonably could have believed that the arrest was lawful." *Id.* When viewing this claim,

"state law[2] defines the offense for which an officer may arrest a person, while federal law dictates whether probable cause existed for an arrest." *Id.* at 215.

Regets sets forth the same arguments in her false arrest/false imprisonment claim as she does in her improper search and seizure claim—namely, that there was not probable cause to obtain her warrantless arrest. As outlined in our analysis of Regets's search-and-seizure claim, Defendants had probable cause to arrest Regets based on the information they possessed at the time of her arrest. They reasonably could have believed her arrest was lawful based on Kish's statement.

"Probable cause to make an arrest exists if the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Arnold v. Wilder*, 657 F.3d 353, 363 (6th Cir. 2011) (internal quotation marks omitted). Thus, if a reasonable official could have concluded that there was a "fair probability" that Regets committed or was about to commit a crime, Defendants are entitled to qualified immunity. *See Kennedy v. City of Villa Hills, Ky*, 635 F.3d 210, 214 (6th Cir. 2011); *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002).

---

[2] The relevant criminal statute at issue, Michigan Code Law Section 750.329a provides:

> (1)    A person who knows that an individual intends to kill himself or herself and does any of the following with the intent to assist the individual in killing himself or herself is guilty of criminal assistance to the killing of an individual, a felony punishable by imprisonment for not more than 5 years or a fine of not more than $10,000.00, or both:
> (a)    Provides the means by which the individual attempts to kill himself or herself or kills himself or herself.
> (b)    Participates in an act by which the individual attempts to kill himself or herself or kills himself or herself.
> (c)    Helps the individual plan to attempt to kill himself or herself or to kill himself or herself.

M.C.L. § 750.329a.

Defendants assert that, based on their knowledge at the time, there was a fair probability that Regets had committed or was about to commit criminal assistance to suicide. And their knowledge was based, in large part, upon Kish's sworn statement. The law was aptly summarized recently in *United States v. Watkins*, No. 3:12-cr-00085, slip op. at *4 (W.D. Ky. April 10, 2013):

> When an informant's tip is used to establish probable cause, the Court must assess whether probable cause necessary to justify the arrest existed based on the "totality of the circumstances." *Wolfe v. Perry*, 412 F.3 707, 717 (6th Cir. 2005) (quoting *Gates*, 462 U.S. at 230–31). Probable cause to arrest may be based solely on an informant's tip "if the tip appears reliable under the totality of the circumstances." *United States v. Cooper*, 1 F. App'x 399, 403 (6th Cir. 2001) (citing *Gates*, 462 U.S. at 230). And, "[u]nlike a tip from an anonymous informant, a 'tip from a known informant who reputation can be assessed and who can be held responsible if [his] allegations turn out to be fabricated' is far more trustworthy." *United States v. Tillman*, 404 F. App'x 949, 952 (6th Cir. 2010) (quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000)), cert. denied, 131 S. Ct. 1541 (2011).

Kish provided Defendants with a detailed account of the alleged plan to accomplish Steiner's suicide. His initial statement was given both orally and in writing, and it included a handwritten diagram indicating where he had personally seen the medications that Regets would allegedly use to assist Steiner in committing suicide. As a cautionary step, Defendants contacted the prosecutor's office for assistance in evaluating the information provided to them. At the prosecutor's office, Kish repeated his statement under oath, and even when questioned by Stevens, Kish did not deviate from his initial statement. Thus, Kish's statement appeared reliable under the "totality of the circumstances," and Defendants' knowledge was "sufficient to warrant a prudent man in believing that [Regets] had committed or was committing an offense." *Arnold*, 657 F.3d at 363 (internal quotation marks omitted).

For her false arrest and false imprisonment claim, Regets relies on *Radvansky v. City of Olmsted Falls*, 395 F.3d 291 (6th Cir. 2005) to support her assertion that Kish's testimony alone

was insufficient for probable cause. In *Radvansky*, the plaintiff was arrested while breaking into his apartment after his landlord changed the locks and told the police that the plaintiff had abandoned the property and had no privilege to re-enter. *Id.* at 298, 304. We held that probable cause to arrest the plaintiff did not exist when the police relied on the landlord's statement alone and ignored substantial exculpatory evidence indicating the plaintiff did live in the apartment.[3] *Id.* at 305–06.

In contrast, as described above, Kish signed a written statement under penalty of perjury and was questioned under oath about his statement. The officers sought advice from the prosecutor's office and obtained a search warrant from the magistrate judge. Kish provided the identical story to officers twice. This case is distinguishable from *Radvansky*, where officers relied solely on the landlord's unsworn statement and ignored significant exculpatory evidence showing that the tenant lived on the premises, including that both the tenant's driver's license and social security number indicated that he lived at the address. Accordingly, Defendants are entitled to qualified immunity on this claim because they could have reasonably believed probable cause existed and they did not find significant exculpatory evidence at Regets's house or Steiner's hotel contradicting Kish's allegations.

### b. *Estate of Thomas Steiner*

The Estate of Thomas Steiner has also asserted a claim of false imprisonment, alleging that the officers should have known that by seizing Steiner's medication and access to Regets, Steiner would be unable to care for himself and leave his hotel room to receive assistance. As the viability of each claim must be weighed against each defendant individually, the Estate's most

---

[3] Specifically, the plaintiff repeatedly claimed that he lived there, and the officers knew from his driver's license and social security number that his address matched the apartment's address. *Id.* at 306.

viable claim is against Officer Grabowski who seized Steiner's medication. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

However, as the district court properly concluded, no evidence in the record establishes that the officers knew or should have known Steiner would be unable to care for himself without the medication in the seized packages. Grabowski did not confiscate the medication he believed Steiner was using on a daily basis. Officer Cox contacted Steiner and Steiner told him the medications they had left in his room would be sufficient "for a few days." R. 52-3, Cox. Dep. at 21, PageID # 729. Cox inquired to ensure that Steiner would have sufficient medication for the next few days and Steiner reiterated that he would and that he could get a prescription and go to the pharmacy if needed. Moreover, the fact that Steiner was not in his hotel room when the officers arrived further rebuts Regets's allegation that Defendants should have known that Steiner was unable to leave the hotel room without Regets's assistance. Accordingly, Defendants, including Grabowski, had no reason to believe that the absence of certain medication would prevent Steiner from leaving his hotel room.

### 3. Civil Conspiracy

Regets claims that Defendants conspired to obtain a search warrant, arrest her, and detain her without probable cause. "A civil conspiracy under § 1983 is an agreement between two or more persons to injure another by unlawful action." *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (internal citation and quotations omitted). To prevail on a civil conspiracy claim, a plaintiff must prove the following elements: "(1) a single plan existed, (2) [the defendant] shared in the general conspiratorial objective to deprive [the plaintiff] of his constitutional (or federal statutory) rights, and (3) an overt act was committed in furtherance of the conspiracy that caused injury to [the plaintiff]." *Id.* "[A] plaintiff may rely on circumstantial

evidence to establish an agreement among the conspirators." *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012). However, mere speculation and conjecture are insufficient to establish the existence of an agreement. *Moore v. City of Paducah*, 890 F.2d 831, 834 (6th Cir. 1989).

Regets claims that, despite the district court's holding to the contrary, she has presented more than mere speculation and conjecture to support her conspiracy claim. But, Regets fails to explain what evidence beyond her speculations she has presented. The basis of Regets's conspiracy claim is that Defendants conspired in issuing search warrants and arresting and detaining her without probable cause. However, Regets has not presented evidence beyond mere conjecture and speculation to satisfy even the initial element requiring proof of an unlawful agreement among the alleged conspirators.[4] *Hensley*, 693 F.3d at 695. Accordingly, the district court's grant of summary judgment to Defendants on this claim is affirmed.

### 4. Deliberate Indifference

The Estate of Thomas Steiner claims that Defendants acted with deliberate indifference to Steiner's health and safety. "[A] constitutional violation[5] occurs only where the deprivation alleged is sufficiently serious and the [officer] has acted with deliberate indifference to the [plaintiff's] health or safety." *Farmer v. Brennan*, 511 U.S. 825, 825–26 (1994) (syllabus). Deliberate indifference includes both an objective and subjective component. *Id.* at 835–38. The objective component requires that the deprivation alleged be "sufficiently serious," while the

---

[4] Regets argues that the applicable standard for the district court to review this claim was under Federal Rule of Civil Procedure 12(b)(6), as Defendants' brief alleged that Regets had not alleged sufficient facts. The district court properly reviewed the claim under Federal Rule of Civil Procedure 56, which was the substance of the motion before the court.

[5] While neither party expressly addresses which constitutional right of Steiner's was violated, the complaint alleges claims under the Fourteenth and Eighth Amendment. R. 1, Compl. at 16, PageID # 16. While Steiner was not in custody, and hence there can be no Eighth Amendment claim, state officials may violate the Due Process Clause in noncustodial settings when "their affirmative actions directly increase the vulnerability of citizens to dangers or otherwise place citizens in harm's way." *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002).

subjective component requires a plaintiff to establish that the government officials had a "sufficiently culpable state of mind." *Id.* at 834 (internal quotation marks omitted). To establish the subjective component, the plaintiff must establish that the "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. However, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838.

Although the Estate's deliberate-indifference claim is arguably the most viable one, it also fails. The Estate claims that a genuine issue of fact exists as to whether Defendants knew of and disregarded an excessive risk to Steiner's safety and health when Grabowski took some of his medications from his hotel room. Defendants counter by stating that their actions were not arbitrary, and the record does not support a finding that Defendants acted with deliberate indifference.

The district court framed the alleged constitutional violation as follows: the "officers violated Thomas Steiner's substantive due process rights by removing the packages of medications from his room and thereby leaving him vulnerable and/or increasing the risk that he would die." R. 57, Dist. Ct. Op. at 31, PageID # 1008. Because both parties focus on the subjective component of the inquiry, we assume that there is no dispute as to the objective component. Accordingly, the question is whether Defendants possessed the requisite awareness that Steiner's health or safety was in danger when they took the prescription medicines from his hotel room.

Defendants cannot claim they were not aware that Steiner had some serious medical conditions. As the record made clear, when Grabowski was searching Steiner's hotel room to confiscate the bags of medication, he noticed nine pill bottles lined up, which he concluded were for "daily medication." R. 52-5, Grabowski Dep. at 5, PageID # 742. Furthermore, when Defendants raided Regets's home they discovered 25 separate prescriptions; thus, at a minimum Defendants could infer that Steiner likely had a serious medical condition.

To establish a deliberate indifference claim, however, Regets must establish that the officers were aware that a "substantial risk of serious harm existed." *Farmer*, 511 U.S. at 837. She has not. As previously noted, Grabowski seized two packages of medications but chose not to confiscate the nine pill bottles lined up on the table because, based on how the bottles were lined up, he thought they were Steiner's daily medications. Accordingly, Grabowski deliberately took a step he thought would ensure that no "serious harm existed" as to Steiner's health.

Defendants also took further steps to ensure no serious harm existed to Steiner's health. Cox called[6] Steiner while in his hotel room to ask specifically whether the medications he was leaving in the room would be sufficient for him. Steiner responded that he would be fine for a "few days" with the remaining medications and assured Cox that if he needed more he could get another prescription from a doctor and go to a pharmacy. Furthermore, Cox questioned Steiner extensively about his mental state and whether he had contemplated or was contemplating suicide. Steiner explained that he had talked a lot about suicide but that at the time of the call with Cox, he did not want to kill himself. Given Steiner's representations, Grabowski and Cox were not deliberately indifferent to a "substantial risk of serious harm." It cannot be said that

---

[6] Regets claims that "we have no record of" Cox's phone conversation with Steiner. There may not be a recording or transcript of the phone call, however Cox's deposition testimony constitutes evidence of the conversation.

they knew of and disregarded an excessive risk to Steiner's health or safety because Steiner himself confirmed he would have access to sufficient medication. Indeed, rather than disregard any potential risk, the officers took special precautions to ensure that Steiner was not in danger of serious harm. While Regets claims that Defendants were obligated to take Steiner into custody so that he could receive proper medical or psychiatric evaluation, she identifies no legal basis for this claim.[7] While Thomas Steiner's death is certainly a tragedy, no genuine issue of material fact exists as to whether Defendants were "deliberately indifferent" to Steiner's health. We affirm the district court's grant of summary judgment on this claim.

### 5. Intentional Infliction of Emotional Distress

Regets claims that Defendants should be liable for intentional infliction of emotional distress based on the totality of their actions during the incident. To establish the tort of intentional infliction of emotional distress in Michigan, "a plaintiff must prove the following elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Hilden v. Hurley Med. Ctr.*, 831 F. Supp. 2d 1024, 1046 (E.D. Mich. 2011) (internal quotation and citation omitted). "Liability for intentional infliction of emotional distress [is] found only where the conduct complained of [was] so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

---

[7] Regets also relies on an affidavit from her forensic expert, Werner Spitz, M.D. which states that "had Mr. Steiner been appropriately medically and/or psychiatrically evaluated on Friday, June 19, 2009, he would have been given his prescribed medications and would not have died on Monday, June 22, 2009." R. 52-10. Aff. Werner Spitz at 6, PageID # 775. Spitz's testimony, that Steiner would not have died if he had been evaluated on June 19, 2009 constitutes mere speculation. As Defendants correctly state, "[i]n order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence that would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy." *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (quotation and citation omitted).

regarded as atrocious and utterly intolerable in a civilized community." *Id.* (internal quotations and citation omitted).

Regets claims that a genuine issue of material fact remains as to whether Defendants' conduct amounted to extreme and outrageous behavior. Regets recites all the facts of the incident to suggest that the totality of police conduct during the episode was "extreme and outrageous." However, as detailed above, not only were the police officers justified in crediting Kish's testimony of Regets's plan, but Defendants' conduct does not meet the high bar required to constitute "extreme or outrageous" conduct that went beyond "all possible bounds of decency and should be regarded as utterly intolerable in a civilized community." *Hilden*, 831 F. Supp. 2d at 1046 (internal quotation marks omitted). The facts recited would not arouse the resentment of an average member of the community against Defendants or lead one to exclaim, "Outrageous!" *Doe v. Mills*, 536 N.W.2d 824, 834 (Mich. Ct. App. 1995).

## 6. Liability of City of Plymouth

Regets claims that the City of Plymouth should be liable for the officers' actions, because the City failed to train the officers adequately. "Under § 1983, a municipality can only be held liable if the plaintiff demonstrates that the injury suffered was a direct result of the city's official policy or custom." *Slusher v. Carson*, 540 F.3d 449, 456–57 (6th Cir. 2008) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978)). "To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a

municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). "This Court has identified two situations justifying a conclusion of deliberate indifference in claims of failure to train or supervise." *Ellis*, 455 F.3d at 700. The first is the "failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." *Id*. at 701 (internal quotations and citation omitted). The second type of "deliberate indifference is where the city fails to act in response to repeated complaints of constitutional violations by its officers." *Id.* at 701 (internal quotations and citation omitted). To establish deliberate indifference, a plaintiff must show "prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Marcilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012) (internal quotation marks omitted).

Regets cannot establish municipal liability as she has "not shown that the [City] knew of prior unconstitutional actions by its officers and failed to respond." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005). The record does not disclose any history of similar incidents or any basis from which a fact finder could conclude that the City had notice that officer training regarding probable cause for searches and arrests was deficient. *Miller v. Calhoun Cnty.*, 408 F.3d 803, 816 (6th Cir. 2005). Rather, the record shows that the policy of the City of Plymouth police department was that an arrest could only be based on probable cause or warrant.

### III.

The district court's grant of summary judgment to all Defendants on all counts is **AFFIRMED**.