RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0325p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

NIKI FRENCHKO,

        *Plaintiff-Appellee*,

    *v.*

PAUL MONROE; TRUMBULL COUNTY SHERIFF'S DEPARTMENT; HAROLD WIX; ROBERT ROSS; MAURO CANTALAMESSA; TRUMBULL COUNTY BOARD OF COMMISSIONERS; TRUMBULL COUNTY, OHIO; FRANK FUDA,

        *Defendants-Appellants*.

No. 24-3116

─────────────

Appeal from the United States District Court for the Northern District of Ohio at Youngstown.
No. 4:23-cv-00781—J. Philip Calabrese, District Judge.

Argued: March 19, 2025

Decided and Filed: November 26, 2025

Before: CLAY, NALBANDIAN, and DAVIS, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Daniel T. Downey, FISHEL DOWNEY ALBRECHT & RIEPENHOFF LLC, New Albany, Ohio, for Appellants Paul Monroe, Mauro Cantalamessa, Frank Fuda, and Trumball County. Andrew N. Yosowitz, TEETOR WESTFALL, LLC, Columbus, Ohio, for Appellants Robert Ross and Harold Wix. Matt Miller-Novak, BARRON, PECK, BENNIE & SCHLEMMER, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Daniel T. Downey, Helen K. Sudhoff, FISHEL DOWNEY ALBRECHT & RIEPENHOFF LLC, New Albany, Ohio, Andrew N. Yosowitz, TEETOR WESTFALL, LLC, Columbus, Ohio, for Appellants. Matt Miller-Novak, BARRON, PECK, BENNIE & SCHLEMMER, Cincinnati, Ohio, David J. Betras, BETRAS, KOPP & MARKOTA, Canfield, Ohio, for Appellee.

    DAVIS, J., delivered the opinion of the court in which CLAY, J., concurred, and NALBANDIAN, J., concurred in all but Part III.B.1. NALBANDIAN, J. (pp. 25–29), delivered a separate opinion dissenting in part.

---

**OPINION**

---

DAVIS, Circuit Judge.  Niki Frenchko filed this civil-rights action after she was arrested at a Trumbull County Board of Commissioners meeting while serving as one of three elected commissioners.  After running on a campaign platform to expose corruption and inefficiencies purportedly committed by her fellow commissioners, Frenchko sought to deliver on that promise.  At a June 2022 meeting, Frenchko accused the Trumbull County Jail and Trumbull County Sheriff's Department of ignoring concerns of inmate mistreatment.  Her accusations angered her fellow commissioners and the County Sheriff, Paul Monroe.  During a meeting later that summer, Commission Chair Frank Fuda asked the county clerk to read into the record a letter prepared by Monroe denying Frenchko's claims of inmate mistreatment.  Frenchko's actions during the reading of the letter led two Sheriff's Department officials to arrest her for disrupting a lawful meeting in violation of Ohio Revised Code § 2917.12(A)(1).  Frenchko asserted civil-rights violations relating to her arrest against her fellow commissioners; three Trumbull County Sheriff's Department officials; and Trumbull County, its Sheriff's Department, and its Board of Commissioners.  She moved for partial summary judgment; the defendants raised various immunity defenses and moved for summary judgment on all counts.  The district court granted in part and denied in part both Frenchko's motion for partial summary judgment and the defendants' joint motion for summary judgment.  The defendants appeal.  For the following reasons, we AFFIRM in part, REVERSE in part, and REMAND.

## I.  Background

### A.  Facts

Frenchko was elected to serve on the Trumbull County Board of Commissioners ("Board") and took office in 2021.  The Board has three elected members and acts as the "policy-determining body of the county."  Ohio Rev. Code Ann. § 302.12.  During the period relevant to this suit, Frenchko's fellow commissioners were Frank Fuda and Mauro Cantalamessa.  Both

Fuda and Cantalamessa were incumbents. As commission chair, Fuda's responsibilities included running the Board's meetings and ensuring the commissioners followed the rules of decorum.

Through her role as county commissioner, Frenchko planned to shed light on government issues she believed had been left unaddressed by the incumbents. Once she was elected, Frenchko often criticized her fellow commissioners' actions. By her account, Fuda and Cantalamessa "have been extremely embarrassed by [her] exposing how they've been doing business." (Frenchko Dep. Vol. 1, R. 49, PageID 1053). The opinions Frenchko shared at Board meetings often differed from her colleagues' and led to lively disagreements. These disagreements sometimes led the commissioners to disregard their rules of decorum; they often interrupted one another and lodged personal insults toward each other. Though deputies rarely attended the meetings before Frenchko took office, over time disruptions at meetings led the sheriff's office to provide security at more Board meetings. Early in her tenure, Frenchko began livestreaming the Board's meetings through her cell phone. She recorded the meetings relevant to this appeal: the June 1, 2022, meeting and the July 7, 2022, meeting.

At the June meeting, Frenchko read into the record concerns "about inmate medical care" she had received in a letter from "the mother of an inmate in custody at the Trumbull County Jail" complaining that her son had received inadequate medical treatment. (June 1, 2022, Meeting Mins., R. 51-1, PageID 1300). The letter criticized the Sheriff's Department for its failure to respond to the mother's requests for improved inmate care. After reading this letter, Frenchko remarked that this treatment of inmates "was unacceptable" and she "hopes the rest of the Board of Commissioners have half a heart when it comes to inmate care." (*Id.*).

On July 5, 2022, Sheriff Paul Monroe wrote a letter responding to the criticisms Frenchko had raised at the June meeting. In his letter, Monroe condemned Frenchko's choice to "public[ly] air the contents of the letter without first inquiring" with the Sheriff's Department or the jail as to whether the allegations had merit. (*Id.* at 1301). He particularly took issue with Frenchko's choice to read the letter at the meeting, stating: "Commissioner Frenchko's presentation not only unnecessarily, inappropriately, and inaccurately besmirched the performance of the men and women operating the Trumbull County Jail but also negatively

portrayed both the performance and the professional reputation of the" jail's medical service provider. (*Id.* at 1302). He concluded by requesting that Frenchko issue a public apology.

Monroe took this letter to the Board's office and asked that a copy of the letter be delivered to each commissioner. After receiving the letter, Fuda called Monroe and asked Monroe if he wanted to read the letter at an upcoming Board meeting. Monroe declined, but indicated he did not object to Fuda's suggestion that Fuda himself read the letter into the meeting record.

The Board held their next meeting on July 7, 2022—where the events giving rise to this litigation occurred. Sgt. Harold Wix and Sgt. Robert Ross were assigned by the sheriff's office to serve as security at the meeting. Prior to the July meeting, neither Wix nor Ross knew any of the commissioners personally. Nor did they know that Frenchko had criticized Monroe or the jail's medical care at a prior meeting or that Monroe had written a letter responding to those criticisms. In executing their security duties, Wix and Ross observed the meeting from the back wall of the hearing room, seated on opposite sides from one another.

About thirty minutes into the meeting, Fuda directed the Board's clerk to read Monroe's letter. Monroe's letter was not on the official meeting agenda, but it was not out of the ordinary for the Board to add items to the agenda during meetings. Frenchko had been livestreaming the meeting from her cellphone at her seat on the dais. After Fuda attempted to block Frenchko's view of the clerk with a piece of paper, Frenchko moved closer to the clerk and continued to record. As the clerk neared the end of the letter, Frenchko began to interrupt her and speak over her. Frenchko objected that the letter had not been included on the meeting agenda, and she repeatedly disputed the letter's accuracy. In response to Frenchko's interruptions, Fuda called for a point of order, repeatedly banged his gavel, and raised his voice to tell Frenchko to let the clerk read the letter. Frenchko continued interrupting the clerk, mocking her and causing her visible discomfort. Members of the audience urged Frenchko to stop upsetting the clerk.

During Frenchko's actions, Wix and Ross appeared to be sending intermittent text messages, though the record does not reveal to whom any messages were sent or the messages'

contents.**[1]**  When the clerk finished reading Monroe's letter, Frenchko returned to her seat on the dais and was able to respond.  She spoke for approximately two minutes.  While Frenchko was speaking, Cantalamessa received a text message from the head of a county department advising that he could have Frenchko removed for being disruptive in a public meeting.  Cantalamessa then interrupted Frenchko, stating that her comments were "getting disruptive," and her commentary on "the chief law enforcement officer in Trumbull County [is] unacceptable." (Frenchko Cellphone Vid., R. 52, 46:07–46:16).  Shortly after that, Fuda interrupted to express his frustration at Frenchko for constantly interrupting everyone.  Fuda gave Frenchko a chance to apologize to Monroe or the meeting would move on to the next item on the agenda; instead, Frenchko continued to rebut Monroe's letter.  Fuda then called out to Wix and instructed the clerk to move on although Frenchko continued to speak.

Frenchko then began to speak on a new topic, which was also not on the meeting's agenda.  Around the same time, Ross gave a thumbs-up signal in Cantalamessa's direction, after which he and Wix approached Frenchko and asked her to stand up because she was "being very disruptive" of the meeting.  (*Id.* at 47:00–47:08).  Frenchko objected that she was not being disruptive, but Wix nonetheless pulled back Frenchko's rolling chair and directed her to exit the room.  Cantalamessa can be heard in the background stating that Frenchko can be arrested for disrupting the meeting.  Wix and Ross removed Frenchko from the room within thirty seconds of Fuda's call-out to Wix.  They placed her under arrest for disrupting a public meeting.  Wix and Ross took Frenchko to the Trumbull County Jail, where she was processed and released that day. The next morning, Ross filed a complaint to obtain a post-hoc determination of probable cause from the local municipal court's deputy clerk.  The court dismissed the complaint three months later.

About thirty minutes after her arrest, a reporter from WKBN First News published a story depicting Monroe's letter and a statement from Monroe about the arrest.  Monroe was not present at the July meeting.  Monroe admits he texted the reporter four minutes before Frenchko's arrest and again after he learned of the arrest.  He does not recall the subject of those messages.

---

**[1]**Wix and Ross's phone records reveal they were not texting one another or any other defendant.

Also within minutes of Frenchko's arrest, Cantalamessa exchanged crude and profane text messages with other county employees celebrating the arrest. When the county auditor texted Cantalamessa, "What the hell happened to the b\*tch," Cantalamessa responded, "Handcuffed and removed." (Cantalamessa Text Messages, R. 47-10, PageID 1022). Cantalamessa's text records show that, over the course of the day, he sent and received several insulting memes targeted at Frenchko and called her a "[s]h\*tbag" and a "[t]errible person to boot." (*Id.* at 1024, 1026). Cantalamessa denies having texted any defendant during the July meeting, but records show that he did communicate with Monroe on August 2, 2022, expressing his displeasure with Frenchko's public-facing response to her arrest. That response included filing this lawsuit claiming the arrest violated state and federal law.

### B. Procedural History

Frenchko's complaint alleges fourteen counts against Wix, Ross, Fuda, Cantalamessa, Monroe, Trumbull County, the Trumbull County Board of Commissioners, and the Trumbull County Sheriff's Department. As relevant to this appeal, Frenchko brought claims under 42 U.S.C. § 1983 against each defendant for Fourth Amendment unlawful seizure and First Amendment retaliatory arrest. She also brought state law claims for false arrest against the individual defendants and civil conspiracy against all the defendants.

Frenchko moved for summary judgment on her federal law claims, and the defendants moved for summary judgment on all claims. The district court granted each motion in part. Relevant here, the district court granted Frenchko summary judgment on her claims for First Amendment retaliation and Fourth Amendment unlawful seizure against each defendant and denied summary judgment to the defendants on those same claims. It also denied the defendants statutory immunity from Frenchko's claims for false arrest and civil conspiracy under Ohio law. The district court's remaining dispositive rulings are not at issue here.

Defendants appeal. They challenge the district court's denial of their claims for qualified immunity. They also contest the district court's denial of statutory immunity for Wix and Ross on Frenchko's state false arrest claim, and for all the individual defendants on her civil conspiracy claim.

## II. Jurisdiction and Standard of Review

"[Q]ualified immunity rulings are reviewable on interlocutory appeal to the degree they present 'a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case.'" *Tanner v. Walters*, 98 F.4th 726, 732 (6th Cir. 2024) (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). Where, as here, "an appeal from a denial of summary judgment is presented in tandem with a grant of summary judgment, this court has jurisdiction to review the propriety of the district court's denial of summary judgment." *Tennessee ex rel. Wireless Income Props., LLC v. City of Chattanooga*, 403 F.3d 392, 395 (6th Cir. 2005) (internal quotation marks and citation omitted).

We review the district court's denial of summary judgment de novo. *Tanner*, 98 F.4th at 731. In doing so, we construe the facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020). Summary judgment is proper when no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the movant establishes the lack of a genuine issue of material fact, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)). "When reviewing cross-motions for summary judgment, we must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

## III. Qualified Immunity

Qualified immunity protects government officials for actions taken within the scope of their authority which do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We employ a two-part test to determine if qualified immunity applies, in which we ask "(1) whether the facts, when taken in the light most favorable to the party asserting the injury, show

the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such 'that a reasonable official would understand that what he is doing violates that right.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). If the answer to either part of the test is "no," then the officer is entitled to qualified immunity. And we may consider these requirements in the order of our choosing. *Pearson v. Callahan*, 555 U.S. 223, 227 (2009).

## A.  Fourth Amendment

Defendants contend that the facts in the record do not support a reasonable conclusion that they violated Frenchko's Fourth Amendment rights. So the district court wrongly denied them qualified immunity on that claim. Viewing all facts in the light most favorable to Frenchko and rejecting any disputed facts, we agree.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. To impose liability for a Fourth Amendment violation under § 1983, Frenchko must, therefore, prove that she was subjected to an unreasonable seizure. *Graves v. Mahoning Cnty.*, 821 F.3d 772, 775 (6th Cir. 2016) (citing *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989)). "It is beyond debate that an arrest made without probable cause" is unreasonable and "violates the Fourth Amendment." *Smith v. City of Wyoming*, 821 F.3d 697, 714 (6th Cir. 2016). But the arresting officer(s) will still be entitled to qualified immunity so long as they "reasonably but mistakenly conclude[d] that probable cause [wa]s present." *District of Columbia v. Wesby*, 583 U.S. 48, 65 (2018) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). We generally must consider separately whether each defendant violated the plaintiff's constitutional rights. *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (per curiam). However, because Frenchko's success on her Fourth Amendment claim rises and falls on whether it was objectively reasonable for Wix and Ross to believe they had probable cause to arrest her, we may dispose of this appeal as to all defendants by resolving this question.

Wix and Ross unquestionably seized Frenchko when they arrested her. *See Torres v. Madrid*, 592 U.S. 306, 311 (2021). Frenchko's seizure was unreasonable only if the officers

lacked probable cause to arrest her.  This is because "[a] warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." *Wesby*, 583 U.S. at 56.  Probable cause is a "low bar." *United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021).  It "exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry v. United States*, 361 U.S. 98, 102 (1959); *Arnold v. Wilder*, 657 F.3d 353, 363 (6th Cir. 2011).  And in assessing whether qualified immunity should apply, we ask whether, "viewed from the standpoint of an objectively reasonable police officer," there was probable cause to arrest. *See Wesby*, 583 U.S. at 56–57 (citation omitted).

Here, our review turns on whether it was objectively reasonable for Wix and Ross to believe that Frenchko had violated or was violating Ohio Revised Code § 2917.12(A)(1).**[2]** *See Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)).  That provision prohibits a person "with purpose to prevent or disrupt a lawful meeting, procession, or gathering" from doing "any act which obstructs or interferes with the due conduct of such meeting, procession, or gathering."  Ohio Rev. Code Ann. § 2917.12(A)(1).  Ohio courts have determined that, under the statute's plain meaning, it "prohibits any person from acting with a purpose to prevent or disrupt a lawful gathering and from succeeding in that effort by actually obstructing or interfering with its due conduct." *Columbus v. Doyle*, 776 N.E.2d 537, 540 (Ohio Ct. App. 2002).  Furthermore, when a prohibition targets specific conduct, a person acts purposefully when it is the person's "specific intention to engage in conduct of that nature."  Ohio Rev. Code Ann. § 2901.22(A).  So, for us to conclude that probable cause existed, Wix and Ross must have had a reasonable belief, based on the

---

**[2]**The arrest report specifies only that Frenchko was arrested under Ohio Revised Code § 2917.12.  That provision criminalizes both doing any act to obstruct or interfere with a lawful meeting and making an utterance or gesture "which outrages the sensibilities of the group."  Ohio Rev. Code Ann. § 2917.12(A)(1) & (2).  Because Frenchko's conduct could only fall within the first category, the district court and the defendants agree that she was arrested for violating that provision, and Frenchko does not dispute this.  We adopt this presumption as well.

information they had at the time of the arrest, that Frenchko intended to engage in conduct that would obstruct or interfere with the due conduct of the Board meeting.**3** *Arnold*, 657 F.3d at 363.

On that front, Frenchko's circumstances resemble those we recently considered in *Burton v. City of Detroit*, No. 22-1222, 2022 WL 17177323 (6th Cir. Nov. 23, 2022). Officials there arrested Burton (also a commissioner), for disrupting a Detroit Board of Police Commissioners meeting in violation of a state anti-disruption statute. *Id.* at \*2. The Michigan statute at issue there, like Ohio Revised Code § 2917.12(A)(1), criminalizes the actions of anyone who "make[s] or excite[s] any disturbance or contention . . . at any . . . public meeting where citizens are peaceably and lawfully assembled." Mich. Comp. Laws § 750.170. In evaluating probable cause in *Burton*, we observed that Burton continued talking despite the commission's chair ruling him "out of order" three times, and a law enforcement officer warning Burton that he could be removed if his conduct continued. 2022 WL 17177323, at \*1. The officers stated that they arrested Burton because he was preventing the chair from moving forward with the meeting, and the interruption had led to public disruption from community members in attendance. *Id.* at \*1–2. On these facts, we concluded that the officers had established probable cause for Burton's arrest. Noting that the Michigan statute prohibited individuals from making a "disturbance" at a public meeting, we probed the meaning of that term under Michigan law. Disturbance there meant "[a]ny act causing annoyance, disquiet, agitation, or derangement to another, or interrupting his peace[.]" *Id.* at \*3 (alterations in original) (quoting *People v. Weinberg*, 149 N.W.2d 248, 251 (Mich. Ct. App. 1967)). With this understanding, we circled back to Burton's behavior. Several facts led us to conclude that an observing officer reasonably could find that Burton violated the statute. Those facts included that Burton: (1) continued speaking even after the chair told him multiple times he was out of order; (2) would not stop even after receiving a warning that he'd be removed; and (3) generally would not let the chair advance the meeting. *Id.*

Like the arresting officers in *Burton*, Wix and Ross say that they arrested Frenchko because she was disrupting the meeting under Ohio Revised Code § 2917.12(A)(1).

---

**3**Frenchko does not dispute that her actions meet this "purposefully" standard. She intended to interrupt the clerk, which—if found to be disruptive—would satisfy the mens rea requirement under Ohio law. *See* Ohio Rev. Code Ann. § 2901.22(A).

We therefore first consider the scope of conduct proscribed by § 2917.12(A)(1).  And crucial to this consideration is the meaning of the terms "obstruct" and "interfere" as they are used in Ohio law.  *See Burton*, 2022 WL 17177323, at *3.

The statute itself does not define "obstruct" or "interfere," which leaves us with only *Columbus*'s moderately helpful observation that the statute's plain meaning extends to persons "acting with a purpose to prevent or disrupt a lawful gathering" and "actually obstructing or interfering with its due conduct."  776 N.E.2d at 540.  To build on this understanding, we can look to the ordinary meaning of these terms.  And for that, dictionary definitions can be useful. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566–67 (2012).  "Obstruct" means "[t]o make difficult or impossible; to keep from happening; hinder."  *Obstruct*, Black's Law Dictionary (12th ed. 2024); *Obstruct*, Webster's New World College Dictionary (5th ed. 2020) (meaning "to hinder (progress, an activity, etc.); impede").  "Interfere" means to "obstruct[] normal operations or interven[e] or meddl[e] in the affairs of others."  *Interference*, Black's Law Dictionary (12th ed. 2024); *Interfere*, Webster's New World College Dictionary (5th ed. 2020) (meaning "to come in or between for some purpose; intervene").

With this insight into the meaning of the relevant statutory terms and the scope of the statute, we turn then to Frenchko's conduct.  The video of the meeting captured her actions: When Fuda asked the clerk to read Monroe's letter, Frenchko interrupted the clerk numerous times, even leading the clerk to reposition in her seat and stop reading to answer a question Frenchko posed to her in the middle of her reading.  Fuda called for a point of order, banged his gavel, and informed Frenchko that her conduct was getting disruptive, but Frenchko continued talking over the clerk.  From their respective vantage points toward the back of the meeting room, Wix and Ross "saw and heard Ms. Frenchko interrupt the reading of the document into the record at least four times."  (Ross Decl., R. 51-11, PageID 1345; Wix Decl., R. 51-12, PageID 1361).  They also heard "Fuda repeatedly ask[] Ms. Frenchko to stop interrupting and speaking over the clerk."  (Ross Decl., R. 51-11, PageID 1345; Wix Decl., R. 51-12, PageID 1362).  And both officers heard members of the public ask Frenchko to stop this behavior.

After allowing Frenchko to respond to the letter for approximately two minutes, Fuda offered Frenchko a chance to apologize to Monroe—a request that was included in the letter—or the meeting would move on to the next agenda item.  Wix and Ross observed Frenchko ignore Fuda and continue talking.  When Frenchko shifted topics, Fuda ordered the clerk to move on, but Frenchko declined to yield the floor.  Both officers concluded, "Frenchko was disrupting the meeting," so they "made the decision to remove" her.  (Ross Decl., R. 51-11, PageID 1346; Wix Decl., R. 51-12, PageID 1362).  Because the officers observed Frenchko "prevent or disrupt" the meeting by blocking it from moving forward, as prohibited by Ohio Revised Code § 2917.12(A), it was objectively reasonable for the officers to believe they had probable cause to arrest her.  *See Columbus*, 776 N.E.2d at 540.

Frenchko raises two arguments to counter the officers' claim of probable cause.  First, she contends that the officers arrested her for the content of her speech, so there could be no probable cause.  It is true that, "protected speech can be evidence that a speaker committed a separate crime, [but] the First Amendment bars its use as the sole basis for probable cause." *Novak v. City of Parma*, 33 F.4th 296, 304 (6th Cir. 2022); *see also Reichle v. Howards*, 566 U.S. 658, 668 (2012).  Even protected speech, however, can be subject to reasonable time, place, and manner restrictions.  *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985).  Frenchko's argument essentially asks us to acknowledge no distinction between her speech as speech and her speech as conduct.[4]  But we have recognized that, although officers lack probable cause to arrest "based on the *content*" of speech, "the *manner* of [the] speech" may be "sufficient to lead [officers] to believe that probable cause existed."  *See Swiecicki v. Delgado*, 463 F.3d 489, 499 (6th Cir. 2006), *abrogated on other grounds by Wallace v. Kato*, 549 U.S. 384 (2007).  In *Burton*, the fact that Burton was speaking on a matter of public concern—i.e., engaging in protected speech in his capacity as an elected official—did not diminish the defendant officers' authority to enforce Michigan's anti-disruption statute against him.  2022 WL 17177323, at *3.  The same holds true for Frenchko; her speech on a matter of public concern—jail conditions—was subject to the reasonable restrictions contained in Ohio

---

[4]Frenchko failed in her challenge to the facial validity of Ohio Revised Code § 2917.12(A)(1) in the district court.  (*See* Op. & Order, R. 61, PageID 1998).  And she has not reprised this challenge on appeal.  So we assume without deciding that the statute is a reasonable time, place, and manner restriction on speech.

Revised Code § 2917.12(A)(1). So even viewing the facts in the light most favorable to her, the record reflects that Wix and Ross arrested Frenchko not for what she said, but rather for her actions in repeatedly interrupting and speaking over others, refusing multiple requests to yield the floor as directed by the chair, and further antagonizing the visibly shaken clerk during her reading of Monroe's letter by relocating to position herself in such a way as to confront her more directly—even as the clerk expressed displeasure at being video-recorded by Frenchko.

Second, Frenchko claims that Wix and Ross arrested her at Fuda and Cantalamessa's directions. But even if true, it is unclear how this fact would negate the officers' probable cause to arrest her. In other words, so long as it was objectively reasonable to conclude that Frenchko was engaged in conduct proscribed by law, the alleged prodding to arrest her by third parties would have no impact on the constitutionality of her arrest. *See Hoover v. Walsh*, 682 F.3d 481, 500 n.52 (6th Cir. 2012) ("[T]he subjective intent of the arresting officer is not relevant to the probable cause inquiry."). Supported by probable cause, her arrest was lawful. And because Frenchko cannot succeed in demonstrating a violation of her Fourth Amendment rights to satisfy the first qualified-immunity prong, we need not reach the question of whether the right she claims was clearly established.[5] *See Cunningham v. Shelby Cnty.*, 994 F.3d 761, 766 (6th Cir. 2021). Therefore, each of the defendants named in this claim is entitled to qualified immunity.

### B. First Amendment

Wix, Ross, Fuda, Cantalamessa, and Monroe also claim qualified immunity for Frenchko's First Amendment claim for retaliatory arrest. "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*,

---

[5]In any event, "[u]nless discriminatory motive forms part of the cause of action itself, the question whether a plaintiff's right was clearly established is objective, rendering irrelevant the official's motives." *Kennedy v. City of Villa Hills*, 635 F.3d 210, 217 (6th Cir. 2011) (internal citations omitted); *see also Jones v. Naert*, 121 F.4th 558, 568 (6th Cir. 2024) (declining to consider plaintiff's argument that, by turning off his audio recording to discuss the arrest with another officer, the officer knew he violated plaintiff's rights thus making her arrest clearly unlawful because "both our probable cause and qualified immunity doctrines take an objective view"). Thus, for the clearly-established inquiry, instead of asking *why* the officers made the arrest, we ask "whether an officer with no ill will toward [Frenchko] could have believed that he had probable cause to arrest" her. *Kennedy*, 635 F.3d at 217. Because Frenchko's conduct would lead a reasonable officer to believe she violated § 2917.12(A)(1), we answer that question in the affirmative.

547 U.S. 250, 256 (2006). However, when a plaintiff brings a claim for First Amendment retaliatory arrest, she "must plead and prove the absence of probable cause for the arrest." *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019). In other words, "if there is a showing of probable cause, a retaliatory arrest claim [typically] fails." *Hartman v. Thompson*, 931 F.3d 471, 484–85 (6th Cir. 2019).

## 1. Personal Involvement

Before considering the merits of Frenchko's claims, we first consider a threshold matter. To make out her § 1983 claims, Frenchko must establish that each defendant was personally involved in the arrest. Fuda, Cantalamessa, and Monroe argue that they were not personally involved in her arrest, so she cannot maintain a claim of retaliatory arrest against them. We agree.

The district court determined that each defendant was involved in Frenchko's arrest. For its reasoning, the court pointed to its evaluation of Frenchko's conspiracy claim. But that approach misstates the proper legal inquiry. Involvement in a state-law conspiracy, whose elements are distinct from the elements of a First Amendment retaliatory arrest is insufficient. "Section 1983 imposes liability only on a defendant who was personally involved in the unconstitutional action that caused the plaintiff's injury." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 491 (6th Cir. 2020); *see also Rothhaupt v. Maiden*, 144 F. App'x 465, 471 (6th Cir. 2005) (concluding that officers who did not participate in an arrest could not be held liable for constitutional violations occurring during the arrest). And an official's "involvement cannot be characterized as 'mere presence' nor as 'mere backup.'" *Hall v. Shipley*, 932 F.2d 1147, 1154 (6th Cir. 1991). The dissent accurately observes that § 1983 imposes liability on officials, acting under color of law, who "subject[], or cause[] to be subjected" any citizen to a deprivation of their constitutional rights. And we have explained that this means, "the causal connection between the [official's] actions and the alleged constitutional violation" determines whether the official had an "active role" in the unlawful conduct. *Sexton v. Cernuto*, 18 F.4th 177, 185 (6th Cir. 2021). So, Frenchko must present evidence supporting Fuda, Cantalamessa, and Monroe's respective "personal involvement" in the arrest to defeat summary judgment. *Pineda*, 977 F.3d at 491.

As to Fuda and Cantalamessa, Frenchko claims that Fuda called out to Wix when she refused to apologize to Monroe and that Cantalamessa interrupted her, chastised her for criticizing the sheriff, and accused her of disrupting the meeting. Cantalamessa also received a thumbs-up signal from Ross at some point during the incident, and the video shows that he also stated that she could be "removed" for being disruptive. Even viewing these facts in the light most favorable to Frenchko, however, they do not show that either Fuda or Cantalamessa caused Frenchko's arrest. Their actions were those of vocal, albeit frustrated, bystanders, not active participants in the arrest or the decision to arrest. Yet § 1983 liability for a retaliatory arrest is premised on the notion that the officer was "actually involved in placing" the plaintiff under arrest. *See Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 311 (6th Cir. 2005).

Both Fuda and Cantalamessa point out that, as commissioners, they took no action to facilitate the arrest—they had no authority to do so. And Frenchko cites no evidence refuting this fact. Moreover, decisions permitting personal liability for non-law-enforcement officials for unconstitutional arrests made by law enforcement officers are vanishingly rare. Without evidence that Fuda and Cantalamessa played an active role in the arrest, Frenchko cannot create a genuine dispute of material fact that either Fuda or Cantalamessa were personally involved in the decision to arrest her, and both are entitled to judgment as a matter of law.

As for Monroe, Frenchko claims that "he reviewed the facts, the reports, and the charges before Defendants filed those charges against her . . . [and] he approved Frenchko's prosecution because he concluded that [her] speech was emotionally 'abusive' to the clerk." (ECF 34, Appellee's Br. at 27). Monroe, as county sheriff, may be held personally liable for the actions of his subordinates if he "actively participated" in the arrest or at least "implicitly authorized, approved or knowingly acquiesced in the alleged unconstitutional conduct of an offending subordinate." *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (citation omitted). But nothing in the record shows Monroe did any of these things. In fact, the record does not reflect any communication between Monroe, Wix, and Ross about Frenchko's arrest before it occurred. Instead, it shows that when Monroe learned of Frenchko's arrest, he told the Sheriff's Captain to "fast track [Frenchko] and get her out of [the jail] as quick as possible." (Monroe Dep., R. 44-1, PageID 589). And, contrary to Frenchko's assertions, the record does not show that Monroe

took action to "approve" of her arrest.  Instead, Monroe testified he took no action to "okay any charges" though he supposed, in theory, that he could have reviewed the evidence and put a pause on any charges being filed.  (Monroe Dep., R. 44-1, PageID 589–90).  Allegations that a supervising officer failed to act, however, are not enough to establish liability.  *See Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006).  Hence, on this record, a jury could not reasonably conclude that Monroe was personally involved in Frenchko's arrest.

What's more, Frenchko points to no law clearly establishing that non-arresting officials, taking actions like those Fuda, Cantalamessa, and Monroe took, are subject to First Amendment liability in their personal capacities.  She cites one precedential case, *Wood v. Eubanks*, 25 F.4th 414, 423 (6th Cir. 2022), for the proposition that officers may not arrest a person for using language consisting of "personally abusive epithets."  (ECF 34, Appellee's Br. at 26 (citation modified)).  The truth of that legal principle adds little here, though, because in *Wood*, we dealt only with arresting-officer conduct; we had no occasion to opine on the liability of other public officials.  25 F.4th at 421.  So because Frenchko has not established that Fuda, Cantalamessa, and Monroe were personally involved in her arrest, she necessarily cannot make out a § 1983 claim for a First Amendment violation.

The dissent says we have failed to apply the "longstanding rule" that a co-conspirator's actions can be attributed to another member of the conspiracy under § 1983.  Concurring/Dissenting Op. at 25.  We, however, have no qualms with this rule of conspiracies.  But here, neither party has raised the issue of a § 1983 civil conspiracy claim on appeal, so the issue is forfeited.  *See Brown v. Louisville-Jefferson Cnty. Metro Gov't*, 135 F.4th 1022, 1030 (6th Cir. 2025).  The briefing below raised the specter of a § 1983 conspiracy claim.[6]  Yet the district court recognized only a state-law conspiracy claim and did not examine any such

---

[6]Pointing to Frenchko's complaint, the dissent takes issue with, and says "the record belies," this conclusion.  Concurring/Dissenting Op. at 27.  For support, it flags allegations in parts of the complaint's § 1983 counts that Defendants "'worked together'" and "'conspired'" against her.  *Id.* (quoting R. 1, Compl., p.17, PageID 17)).  But pleading a § 1983 civil conspiracy claim requires specificity, not "vague and conclusory allegations unsupported by material facts."  *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 563 (6th Cir. 2011).  In our view, there is reason to question whether Frenchko's allegations meet this "relatively strict" standard.  *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008).  So we are not convinced that we should read into existence an argument for a § 1983 conspiracy claim that the district court did not explicitly recognize.  *See Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975) (observing that appellate courts have no duty to "create a claim which [the litigant] has not spelled out in [her] pleading.").

conspiracy under § 1983. *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383 (6th Cir. 2016) ("Issues not examined by the district court are ordinarily not considered on appeal."). Now, notwithstanding any arguments they may have made below as to a § 1983 conspiracy, before us they raise only a state-law conspiracy.

To be held liable for the acts of a co-conspirator under § 1983, there must be a conspiracy, which means that there must be argument that a § 1983 conspiracy exists. When we decided cases like *Bazzi v. City of Dearborn*, 658 F.3d 598 (6th Cir. 2011), and *Crowley v. Anderson Cnty.*, 783 F. App'x 556 (6th Cir. 2019), cited by the dissent, we had the benefit of extensive briefing on the § 1983 conspiracy issue. But that degree of briefing is not just lacking here, it is, in our view, wholly absent. Defendants' opening brief focuses squarely on state-law conspiracy. And for her part, had Frenchko perceived any error by the district court failing to recognize a § 1983 conspiracy claim, she was free to raise that issue in her responsive brief on appeal or file a cross-appeal. She did neither.

What's more, our caselaw does not say that a plaintiff who sufficiently alleges an Ohio state law conspiracy claim necessarily alleges a § 1983 civil conspiracy claim. *Cf. Siefert v. Hamilton Cnty.*, 951 F.3d 753, 767–68 (6th Cir. 2020) (noting the different elements for a § 1983 civil conspiracy claim and an Ohio state law conspiracy claim). Nor do we read the parties' appellate briefing to simultaneously discuss Ohio state civil conspiracy and § 1983 civil conspiracy. We therefore conclude that the parties forfeited any argument on § 1983 conspiracy. For this reason, we part ways with the dissent and decline to consider whether such a conspiracy serves as a basis for determining personal involvement in Frenchko's arrest.

2. Overcoming No-Probable-Cause Requirement

This leaves Frenchko's personal capacity claims against Wix and Ross, who were undoubtedly involved in arresting Frenchko, and her official capacity claims against each defendant. As discussed, Wix and Ross had probable cause to arrest Frenchko. So Frenchko necessarily has not demonstrated an absence of probable cause. Even so, where an arrest is supported by probable cause, a plaintiff can still create a genuine dispute of material fact as to

whether her protected conduct motivated an arrest under either of two recognized exceptions. Frenchko invokes them both.

*Nieves* itself established the first exception. Under this exception, a plaintiff need not establish a lack of probable cause if she can show through "objective evidence that [s]he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 407; *see also Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024) (per curiam) (explaining that plaintiffs are not required to offer specific comparator evidence to satisfy the exception; the sole limitation on the type of evidence is that it is objective not subjective). Satisfying this exception then opens the door to the traditional First Amendment retaliation framework. And under that framework, in addition to showing an adverse action that would deter a person of ordinary firmness from exercising their constitutional rights, a plaintiff still "must show that the retaliation was a substantial or motivating factor behind the [arrest]." *Nieves*, 587 U.S. at 404 (alteration in original) (quoting *Lozman v. City of Riviera Beach*, 585 U.S. 87, 97 (2018)). That is, the plaintiff must point to evidence of but-for causation. Once a plaintiff has made such a showing, only then does the burden shift back to the defendant to show "that the [arrest] would have been initiated without respect to retaliation." *Id.* (alterations in original) (citation omitted); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Frenchko also asserts that her First Amendment claim remains viable under a second exception to the no-probable-cause rule because "the top policymakers [we]re involved in the decision" to arrest her. (ECF 34, Appellee's Br. at 33). Specifically, under *Lozman v. City of Riviera Beach*, a plaintiff can overcome the no-probable-cause rule by proving "the existence and enforcement of an official policy motivated by retaliation." 585 U.S. at 100. This exception, if available, would apply only to Frenchko's official-capacity claims. *See Novak*, 932 F.3d at 429 ("*Lozman* does not apply where, as here, the plaintiff sues individual officers."). And, even then, it applies only where a plaintiff shows that the justification for the arrest stemmed directly from enforcement of "official municipal policies of retaliation." *Id.*; *Brown v. City of Albion*, 136 F.4th 331, 339 (6th Cir. 2025).

The district court never reached the question of whether Frenchko marshaled sufficient evidence to excuse her from the no-probable-cause rule under either exception, because it found that Frenchko successfully demonstrated a lack of probable cause. As we recently reiterated in *Hayes v. Clariant Plastics & Coatings USA, Inc.*, however, "[o]rdinarily, [we] will not address an issue not passed upon by the district court." 144 F.4th 850, 863–64 (6th Cir. 2025). True, we may exercise our discretion to decide a fully briefed issue not addressed by the district court if it would serve the ends of judicial economy. *Id.* at 864. But here, "the trial court is in the best position" to assess whether Frenchko is excused from the no-probable-cause rule because it is most familiar with the voluminous record and complex facts relevant to that inquiry. *Freed v. Thomas*, 976 F.3d 729, 741 (6th Cir. 2020). And that determination does not significantly overlap with our consideration of other issues that must be resolved in this appeal. So judicial economy would not be better served by our resolution of the issue. Therefore, we remand for the district court to decide these issues in the first instance.

## IV. Ohio Statutory Immunity

Finally, we turn to the defendants' claims of statutory immunity from Frenchko's state law claims. Wix and Ross contest the district court's denial of statutory immunity for Frenchko's false arrest claim, and each of the individual defendants challenges the denial of statutory immunity for civil conspiracy. First, a further word about the constraints of our jurisdiction: We may review interlocutory appeals from a district court's order denying state statutory immunity "only when the state immunity in question would provide complete immunity from suit." *Range v. Douglas*, 763 F.3d 573, 581 (6th Cir. 2014). Here, Defendants claim immunity under Ohio Revised Code § 2744, which "provides Ohio municipalities [and officials] with a complete defense from suit." *Two Bridges, LLC v. City of Youngstown*, No. 22-3506, 2023 WL 4030071, at *2 (6th Cir. June 15, 2023) (citing *Range*, 763 F.3d at 581). We, therefore, have jurisdiction to review the district court's determination in this regard. *Range*, 763 F.3d at 581; *see also Chesher v. Neyer*, 477 F.3d 784, 793–94 (6th Cir. 2007). Nonetheless, our "[i]nterlocutory jurisdiction for denials of immunity is limited to the specific issue of whether immunity was properly denied." *Range*, 763 F.3d at 582. So, to the extent the parties' state immunity arguments stray into the merits of Frenchko's underlying state tort claims, we may

consider them "only if they are inextricably intertwined" with the statutory immunity issue. *Post v. City of Munroe Falls*, 861 F. App'x 69, 73 (6th Cir. 2021) (citing *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 616 (6th Cir. 2015)).

We review de novo the denial of summary judgment on state immunity grounds. *Range*, 763 F.3d at 582. Here, too, summary judgment is proper only "when there are no genuine issues of fact and the moving party is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(a)). We consider each defendant's actions underlying Frenchko's claims against him only as relevant to determining whether statutory immunity applies.

Defendants argue that the district court erred in denying their statutory immunity for Frenchko's Ohio false arrest and conspiracy to commit false arrest claims. Because Frenchko made these claims against only the individual defendants, we look to Ohio Revised Code § 2744.03(A), which protects employees of political subdivisions who are sued in their individual capacities. *Anderson v. City of Massillon*, 983 N.E.2d 266, 270 (Ohio 2012). This provision generally grants government employees statutory immunity for actions taken in relation to governmental or proprietary functions. The immunity it provides, however, is subject to three exceptions, only two of which Frenchko employs: She argues that each defendant acted manifestly outside the scope of his employment, *see* Ohio Rev. Code Ann. § 2744.03(A)(6)(a), and that each acted in bad faith, *see id.* § 2744.03(A)(6)(b).[7] Accepting the district court's factual conclusions and inferences, as we must for the statutory immunity inquiry, we agree that Frenchko has established the existence of a genuine issue of material fact as to whether Defendants acted in bad faith. So we confine our analysis to that exception and need not address whether she also has shown a genuine dispute of fact on whether they acted manifestly outside the scope of their employment.

Ohio law defines bad faith, as relevant to § 2744.03(A)(6)(b), as a "dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in

---

[7]Under Ohio Revised Code § 2744.03(A)(6)(b), an employee cannot assert immunity when he acts "with malicious purpose, in bad faith, or in a wanton or reckless manner." Bad faith is the only relevant standard here because Frenchko does not argue that any defendant acted with malicious purpose or in a wanton or reckless manner. *See Hoffman v. Gallia Cnty. Sheriff's Off.*, 103 N.E.3d 1, 16 n.6 (Ohio Ct. App. 2017).

the nature of fraud, or an actual intent to mislead or deceive another." *Rural Bldg. of Cincinnati, LLC v. Mercer*, 96 N.E.3d 882, 888 (Ohio Ct. App. 2017) (internal quotation marks and citation omitted). In claiming immunity against Frenchko's false arrest claim, Wix and Ross assert that Frenchko adduced no evidence that either acted with an ulterior motive or with an intent to harm her. And as to the civil conspiracy claim, all defendants contend that Frenchko has failed to demonstrate that any of them acted with the requisite intent.

Frenchko generally points to the same evidence to establish bad-faith action for both false arrest and civil conspiracy. Specifically, Frenchko argues that "Appellants' decision to arrest [her] to retaliate against her speech was not lawful." (ECF 34, Appellee's Br. at 37). And she contends that various of the defendants' actions establish their participation in a conspiracy to cause her unlawful (i.e., retaliatory) arrest. These actions, she says, could lead a jury to determine that Defendants acted in bad faith.

By Frenchko's logic, the conspiracy itself shows bad faith. This is because Ohio civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998) (citation omitted). Maliciousness is "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Id.* (internal quotation marks and citation omitted). The malice element overlaps with the bad-faith definition. Malice, as it relates to conspiracy, includes acting purposely to do a wrongful act. *Id.* Similarly, bad faith under the immunity statute means acting with a "dishonest purpose" or "conscious wrongdoing." *Mercer*, 96 N.E.3d at 888 (citation omitted). So, in conspiring to commit an unlawful act, like arresting someone in retaliation for her protected speech, one necessarily acts with bad faith, says Frenchko.

Moreover, civil conspiracy is a derivative cause of action, which requires the plaintiff to prove an underlying unlawful act to succeed. *Williams*, 700 N.E.2d at 868. The underlying unlawful act Frenchko relies on for her conspiracy claim is the alleged false arrest, which requires "(1) the intentional detention of the person and (2) the unlawfulness of the detention." *Morrison v. Horseshoe Casino*, 157 N.E.3d 406, 433 (Ohio Ct. App. 2020) (citation omitted). But her success on the merits of that claim does not impact whether Defendants retain their

immunity. *See Range*, 763 F.3d at 582. Instead, Defendants' entitlement to immunity depends on whether Frenchko has presented evidence from which a rational jury could conclude that Defendants combined to unlawfully arrest her in retaliation for her speech. If so, then the actions underlying her false arrest and civil conspiracy claims were taken in bad faith.

In framing her analysis this way, Frenchko essentially urges us to accept the district court's reasoning. The district court denied each defendant statutory immunity because, by its reckoning, a jury could find that the defendants combined to "orchestrate[] [Frenchko's] arrest before the meeting, in which case their conduct was conspiratorial and in bad faith." (Op. & Order, R. 61, PageID 2029). Several facts led the district court to find a plan existed to unlawfully arrest Frenchko. First, the court considered the fact that Monroe sent Fuda a letter responding to Frenchko's criticisms at the June meeting and the two men conferred about it. From this, said the court, a jury could infer "that the two hatched a plan to arrest Commissioner Frenchko, then enlisted the other individual Defendants." (*Id.* at 2026). Second, the court concluded that a jury could infer that Defendants planned in advance to carry out an arrest based on Cantalamessa's text activity with other county officials during the meeting and Wix and Ross's acting as security on the day of the arrest even though sheriff's deputies did not regularly provide security for Board meetings. Third, a jury could find that Fuda called out to Wix and Ross flashed Cantalamessa a thumbs-up as part of the prearranged plan. Fourth, Wix and Ross arrested Frenchko, in execution of the plan. Lastly, Monroe's texting with a local reporter before the arrest and making statements to her shortly after the arrest are probative of his participation in this scheme.[8]

Taking all inferences in Frenchko's favor, the district court determined that a rational jury could find that these facts prove that Defendants devised a plan to unlawfully arrest Frenchko. Such a plan would necessarily show the Defendants committed "a wrongful act purposely, without a reasonable or lawful excuse." *Williams*, 700 N.E.2d at 868. In other words, planning to arrest someone in retaliation for their protected activity would mean Defendants intended to

---

[8]Frenchko adds to this Cantalamessa and Monroe's destruction—or at least failure to preserve—their text messages from the day of the incident in a purported effort to cover up their scheme. However, the district court made no finding on this point. So we decline to add it to the list of accepted inferences.

take unlawful action. Such "conscious wrongdoing" is bad-faith action, which strips Defendants of their immunity under Ohio Revised Code § 2744.03(A)(6)(b). *Mercer*, 96 N.E.3d at 888 (citation omitted). This is true for the false arrest claim, too, because we focus on the defendants' respective states of mind. A genuine issue of material fact exists as to whether Wix and Ross arrested Frenchko to execute an unlawful scheme, thus acting with the requisite intent to shed the protections of Ohio's immunity statute.

Resisting this conclusion, Wix and Ross argue that they acted with probable cause, or were at most negligent, in arresting Frenchko, so they could not have acted in bad faith. But the presence of probable cause does not foreclose a finding of bad faith. *See Morrison*, 157 N.E.3d at 432. The remainder of Defendants' arguments attack the district court's findings of fact and inferences drawn from those findings. Defendants argue that the evidence does not support any bad-faith action taken. But "such a challenge is purely fact-based, lacking any issue of law" and thus outside our jurisdictional purview. *DiLuzio*, 796 F.3d at 609. Indeed, on this interlocutory appeal, we must accept the inferences that the district court drew from the facts it found. *Id.* at 609–10. Though the connections may be tenuous, we cannot say they are clearly erroneous. And those inferences reveal that a rational jury could find that, in hatching a scheme to unlawfully arrest Frenchko, Defendants acted with a "dishonest purpose," depriving them of their statutory immunity. *Mercer*, 96 N.E.3d at 888 (citation omitted).

Defendants also argue that the intracorporate conspiracy doctrine bars Frenchko's civil conspiracy claim. But this defense works to prevent a plaintiff from proving one of the elements of conspiracy, namely the requirement that "two or more persons" must conspire. *Williams*, 700 N.E.2d at 868 (citation omitted). It is not a doctrine of immunity. *See Jackson v. City of Columbus*, 194 F.3d 737, 753 (6th Cir. 1999) ("[T]he intracorporate conspiracy doctrine" defends against conspiracy liability because "members of the same legal entity cannot conspire with one another."). For that reason, we lack jurisdiction to assess that argument, too. *Range*, 763 F.3d at 582. So we may not consider it.

## V. Conclusion

We AFFIRM in part, REVERSE in part, VACATE the district court's order granting Frenchko partial summary judgment, and REMAND to the district court for further proceedings consistent with this opinion.

---

**CONCURRENCE / DISSENT**

---

NALBANDIAN, Circuit Judge, concurring in part and dissenting in part. I concur with nearly all of the majority's analysis. But on one key point, I part ways. By failing to apply the longstanding rule that conspirators can be liable for each other's acts under § 1983, the majority improperly grants qualified immunity to Fuda, Cantalamessa, and Monroe (the Non-Officer Defendants) on Frenchko's First Amendment retaliation claim. But at the same time, it properly recognizes that live questions remain as to whether Wix and Ross (the Officer Defendants) should receive qualified immunity on that claim. That differential result flows from the majority's conclusion that the conspiracy issue is not properly before us. I disagree. So I would remand the retaliation claim for *all* the individual defendants, not just the Officers. And for that reason, I respectfully dissent only as to Part III.B.1 of the majority opinion.

Section 1983 prohibits any person acting under color of law from "subject[ing], *or caus*[*ing*] *to be subjected*," another to the deprivation of a federal right. 42 U.S.C. § 1983 (emphasis added). So the plain statutory text doesn't just impose liability on the hands-on violator. It also reaches those who "share[] in the general conspiratorial objective" to deprive the plaintiff of her federal rights. *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). "[T]he fact that [a defendant] did not *make* the decision to [arrest] does not per se absolve them from liability." *Sykes v. Anderson*, 625 F.3d 294, 311 (6th Cir. 2010). But "a plaintiff must still prove that a defendant influenced or participated in the decision." *Crowley v. Anderson County*, 783 F. App'x 556, 562 (6th Cir. 2019) (citing *Sykes*, 625 F.3d at 311). Indeed, a defendant "could engage in conduct that might fall short of [a rights violation]" but nonetheless "show[s] that [he] shared a conspiratorial objective" with the hands-on violators. *Id.*; *see also Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985)) (explaining that "[a]ll that must be shown is that there was a single plan [and] that the alleged co[-]conspirator shared in the general conspiratorial objective," not that the co-conspirator themself committed an overt act injuring the plaintiff). And because direct evidence of a conspiracy is rare, a plaintiff can use "circumstantial evidence [to] provide adequate proof of

conspiracy." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000); *see also Bazzi*, 658 F.3d at 602 (explaining that a conspiracy claim can succeed without either express agreement or each conspirator's knowledge of the conspiracy's full scope).

Given § 1983's reach, the district court properly applied principles of conspiracy law to find a jury-triable issue on the Non-Officer Defendants' involvement in the alleged retaliation. As the majority recognizes elsewhere in its opinion, multiple pieces of record evidence support that finding: (1) the fact, if not the contents, of the in-person meeting between Fuda and Monroe the month before Frenchko's arrest; (2) Cantalamessa's text messages with other county officials during and after the arrest; and (3) Monroe's communications with a reporter directly before and after the arrest.[1] Maj. Op. p.22; R.61, Op. & Order, pp.64–65, PageID 2026–27. Viewing those facts in the light most favorable to Frenchko, a reasonable jury could find that the Non-Officer Defendants conspired to plan Frenchko's arrest—even if they didn't themselves carry it out—and are therefore liable under § 1983.

So I agree that because the district court didn't consider how either First Amendment retaliation exception to probable cause might (or might not) apply to the Officer Defendants' conduct, we must remand. But I think we should direct the district court to determine whether the exceptions apply to *all* the individual defendants—not just one subgroup. Of course, that analysis might yield the same result (i.e., that Fuda, Cantalamessa, and Monroe aren't liable for the arrest). But that's an issue best left for the district court.

---

[1]An evidentiary issue that's not currently before us—but will become relevant again on remand—bears discussion. Along with her summary-judgment motion, Frenchko moved to sanction the defendants for spoliating evidence. R.47, Pl. Mot. Summ. J., pp.41–46, PageID 972–77. In denying that request, the district court found that the defendants' conduct met nearly every requirement to warrant the requested sanctions. Even so, it declined to impose sanctions because "even without [the spoliated] information . . . the record establishes" that the defendants violated Frenchko's constitutional rights. R.61, Op. & Order, p.80, PageID 2042. That may have been true at the time. But now that we remand for further consideration, the allegedly spoliated evidence could be a decisive factor moving forward. Here, though, we have no occasion to rule on the matter one way or another, except to note that the district court's reason for denying sanctions might (or might not) come out differently on remand.

The majority says otherwise.  And even though it "ha[s] no qualms" with the conspiracy standard's correctness as a legal matter, the majority refuses to apply it.  Maj. Op. p.16.  Why?  Because the majority concludes that neither party has raised the issue, so it's forfeited.  I disagree.  The parties raised the issue in the district court, the trial court relied on the conspiracy argument to enter judgment against the defendants, and the defendants again challenge the theory on appeal.

To start, the record belies the majority's suspicion that only the "specter" of a § 1983 conspiracy theory appeared below.  Look at the very first filing.  In her complaint, Frenchko alleged under her § 1983 counts that all the individual defendants "worked together" and "conspired" to retaliate against her protected speech.  R.1, Compl., p.17, PageID 17.  As the case progressed to summary judgment, Frenchko's theory that the individual defendants' § 1983 liability could hinge on conspiracy principles persisted.  In response to the defendants' motion for summary judgment, she argued that the "[d]efendants' top policymakers had a plan and conspiracy to arrest" her.  R.54, Resp., pp.18–20, PageID 1419–21.  And she directed that argument squarely at her § 1983 claims.

But perhaps more importantly, Frenchko wasn't a lone voice in the matter.  The district court explicitly melded its state-law civil-conspiracy analysis into its reasoning on the § 1983 claims—contrary to the majority's conclusion that the district court "did not examine any such conspiracy under § 1983."  Maj. Op. pp.16–17; *see* R.61, Op. & Order, pp.55, 64–66, PageID 2017, 2026–28.  Specifically, the court called a section of its opinion "Proper Defendants," which discusses the proper defendants for the arrest claims under § 1983.  The court noted that the defendants argued that only Wix and Ross could be on the hook as the arresting officers, but that Frenchko "maintains that all individual Defendants acted together."  R.61, Op. & Order, p.55, PageID 2017.  Because of that, the court "discusse[d] the proper Defendants in connection with Plaintiff's civil conspiracy claim below."  *Id.*  So the district court incorporated its state-law conspiracy analysis into its discussion of the § 1983 claims against Fuda, Cantalamessa, and Monroe.  And, crucially, the court entered judgment against those defendants.  So we can't disclaim our ability to decide the issue by claiming it wasn't presented below—it was.

At this point, because they lost, the defendants appealed.  So it was incumbent on them, as appellants, to raise issues that would undermine the court's liability finding.  The majority concludes that they did not raise the § 1983 conspiracy issue:  "Defendants' opening brief focuses squarely on state-law conspiracy."  Maj. Op. p.17.  But that's enough in these circumstances.  Given the way the district court structured its opinion, I believe that the defendants' focus on state-law conspiracy suffices to raise the § 1983 conspiracy as well.  Indeed, after spending approximately eight pages of their opening brief detailing their version of the Non-Officer Defendants' conduct, the appellants exhort us to reverse the judgment for insufficient evidence on conspiracy.  "[I]f the court did not have sufficient evidence" to find that the Non-Officer Defendants "engaged in a conspiracy" with Wix and Ross, the appellants argue, there is "similarly insufficient evidence to conclude that these individuals" violated Frenchko's First Amendment right to speak free from retaliation.  Appellant Br. at p.55.  In other words, the appellants framed our consideration of the § 1983 First Amendment issue in terms of conspiracy principles—just like the court below.  And lest the point go unnoticed, the appellants doubled down in their reply brief, arguing that Frenchko failed to produce evidence supporting her "allegation that Defendants-Appellants conspired to effectuate [her] arrest . . . amount[ing] to First Amendment retaliation."  Reply Br. at p.17.

Interestingly, though, the majority doesn't conclude that the defendants have forfeited this issue even though they lost below and allegedly didn't raise it in their opening brief.  This is apparently because Frenchko, the appellee, also purportedly didn't raise the issue in her brief or file a cross-appeal.  But this flips the appellate process on its head.  Appellees don't bring appeals—they respond to them.  And even then, we don't require appellees to respond at all, let alone affirmatively defend the judgment below.  *See Tennessee v. Dep't of Educ.*, 104 F.4th 577, 587 n.6 (6th Cir. 2024) (quoting *Anderson v. Knox County*, No. 22-5280, 2023 WL 4536078, at *7 (6th Cir. July 13, 2023)).

In any event, Frenchko filed a responsive brief. And in it, she addresses the conspiracy issue—albeit mostly in connection with the state-law conspiracy claim. But again, that's not surprising given how the trial court structured its opinion.[2] Given all of this, I think that the § 1983 conspiracy issue is properly before us.

For those reasons, I respectfully dissent from Part III.B.1 of the majority opinion and concur otherwise.

---

[2]The majority suggests that Frenchko could have, or perhaps should have, raised the § 1983 conspiracy issue as a "cross-appeal." But I'm not sure that's correct. We've explained that it's "only necessary and appropriate to file a cross-appeal when a party seeks to enlarge its own rights under the judgment." *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 571 n.2 (6th Cir. 2008) (quoting *Bailey v. Dart Container Corp.*, 292 F.3d 1360, 1362 (Fed. Cir. 2002)). Indeed, a cross-appeal is "*inappropriate* when the only relief sought [by the appellee] is an affirmance of the district court judgment." *Id.* (emphasis added). That's all that Frenchko asks from us—to affirm the district court's judgment.

Perhaps the majority suggests that Frenchko should have filed a conditional or protective cross-appeal. That might have been appropriate if Frenchko sought to preserve the judgment but wanted to challenge an adverse trial-court ruling in the event that we reversed. But, putting aside whether such an appeal is ever required, she didn't lose the § 1983 civil conspiracy argument below. *See Anderson v. Roberson*, 90 F. App'x 886, 888 (6th Cir. 2004) ("In a protective cross-appeal, a party who is generally pleased with the judgment and would have otherwise declined to appeal, will cross-appeal to insure that any errors *against his interests* are reviewed . . . if the main appeal results in modification of the judgment[.]" (emphasis added) (quoting *Hartman v. Duffey*, 19 F.3d 1459, 1465 (D.C. Cir. 1994))). In other words, Frenchko didn't suffer a "distinct and palpable injury" that would permit a prevailing party to appeal. *Owner-Operator Indep. Drivers Ass'n v. Comerica Bank*, 562 F. App'x 312, 331 (6th Cir. 2014) (citation modified). So a conditional cross-appeal wasn't appropriate either.